May E. BOWMAN et al., Plaintiffs-Appellants,

v.

TEXAS EDUCATIONAL FOUNDATION, INC., Defendant-Appellee.

No. 71–1949.

· United States Court of Appeals, Fifth Circuit.

Jan. 31, 1972.

Ed J. Polk, James A. Johnston, Marvin Menaker, Johnston, Polk & Larson, Bader, Wilson, Menaker & Cox, Dallas, Tex., for plaintiffs-appellants.

Morgan Hunter, George D. Byfield, Austin, Tex., for defendant-appellee.

Before GEWIN, GOLDBERG, and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

Twenty "night resident advisers" of a Job Corps project in McKinney, Texas, brought suit to increase their yearly salaries to figures ranging from $12,000 to $15,000, or about twice their presently remitted salaries. They compute this increase in their worth by asking this court to include their sleeping time, at time-and-a-half, under Section 7 of the Fair Labor Standards Act.[1] In addition, they demand the statutory double damages from the Job Corps project for failing to give them their "overtime," amounting to another $2000 to $4000 per year for each plaintiff.[2] It appears to this court that these plaintiffs have taken the tail of one dog, engrafted it onto the posterior of another dog, and asked this court to force the surrogate tail to wage its new engraftee. The result of the plaintiffs' request, as the animal just conjured, is both absurd and offensive to the sensibilities. We affirm the able district judge's summary judgment for the defendant, Texas Educational Foundation.

As "night resident advisers" the twenty employees of Texas Educational Foundation, a non-profit corporation operating the Job Corps center at McKinney, were required to be on duty from 4 p. m., when the corps-women were dismissed from classes, until 8 a. m., when classes began again. The advisers arose with their charges at 6 a. m. and generally supervised all activities during the girls' waking hours from 4 p. m. until 8 a. m. During sleeping hours the adviser was to sleep in the dormitory, although he or she was on call in case of emergency. Each adviser worked four successive days, then took two days off. When one adviser was off duty, another adviser was assigned to supervise two dormitories. All of the employees in this case were hired between February, 1967, and October, 1969. Starting salaries for the plaintiffs ranged from about $6000 per year to $6900 per year, and the salaries of the plaintiffs in March of 1970, the last date on which specific figures are available in the record, ranged from a little over $7000 to almost $7700. Compensation rates for the Job Corps center at McKinney were set under the procedures of Section 610–1(a) of the Economic Opportunity Act, and at least two of the plaintiffs had to receive special

---

1. 29 U.S.C.A. § 207.

2. See 29 U.S.C.A. § 216(b).

permission from the Director under the exception clause of Section 610–1(c).[3]

Appellant advisers do not dispute the accuracy of the Director's determinations that their existing salary levels are roughly commensurate to the prevailing salary levels for similar services in the McKinney area or in areas from which the advisers came immediately prior to assuming their Job Corps positions. Rather, the advisers allege that they have been forced by the Foundation to work more than eight hours per day or forty hours per week without being paid at the overtime rate of Section 7 of the Fair Labor Standards Act. They ask $243,-000 in "back pay" for overtime slept and an additional $243,000 as "liquidated damages" under the statutory provisions. The district judge granted summary judgment for the defendant on the ground that the McKinney Job Corps Center was not within the purview of the Fair Labor Standards Act.[4] We affirm, although on a somewhat different rationale. It is our conclusion that the Fair Labor Standards Act in its entirety does not carry over to the Economic Opportunity Act, and specifically it is our conclusion that Section 7 of the Fair Labor Standards Act (sometimes referred to later as FLSA) does not attach to

---

3. 42 U.S.C.A. § 2951.

Comparability of wages—Average rate of compensation for substantially comparable services; minimum wages

(a) The Director shall take such action as may be necessary to assure that persons employed in carrying out programs financed under part A of subchapter I or subchapter II of this chapter (except a person compensated as provided in section 2942 of this title) shall not receive compensation at a rate which is (1) in excess of the average rate of compensation paid in the area where the program is carried out to a substantial number of the persons providing substantially comparable services, or in excess of the average rate of compensation paid to a substantial number of the persons providing substantially comparable services in the area of the person's immediately preceding employment, whichever is higher or (2) less than the minimum wage rate prescribed in section 206(a) (1) of Title 29.

Roster of personnel receiving salaries of $10,000 or more

(b) Not later than sixty days after the close of the fiscal year 1967 and each fiscal year thereafter the Director shall prepare and submit to the President for submission to the Congress a list of the names of all officers or employees whose compensation is subject to the limitations set forth in subsection (a) of this section and who were receiving at the end of such fiscal year a salary of $10,000 or more per year, together with the amount of compensation paid to each such person and the amount of such compensation paid from funds advanced or granted pursuant to this chapter. No grant, contract or agreement shall be made under any of the provisions of this chapter referred to in subsection (a) of this section which

does not contain adequate provisions to assure the furnishing of information required by the preceding sentence.

Relationship of salary to previous earnings; adjustment to annual basis

(c) No person whose compensation exceeds $6,000 per annum and is paid pursuant to any grant, contract, or agreement authorized under part A of subchapter I or part A of subchapter II (except a person compensated as provided in section 2942 of this title) shall be employed at a rate of compensation which exceeds by more than 20 percent the salary which he was receiving in his immediately preceding employment, but the Director may grant exceptions for specific cases. In determining salary in preceding employment for one regularly employed for a period of less than 12 months per year, the salary shall be adjusted to an annual basis.

4. "The court finds that the plaintiff employees are not within the so-called conventional Fair Labor Standards Act Coverage as 'engaged in commerce or in the production of goods for commerce.' 29 U.S.C.A. § 206(a).

"The court finds that the McKinney Job Corps Center is a non-profit institution which is not organized for a business purpose and hence is not an 'enterprise' within the meaning of 29 U.S.C.A. § 203(r).

"The court finds that the center operated by the defendant pursuant to federal law is not a 'secondary school' within the meaning of 29 U.S.C.A. § 203(w); for, while that section provides that the status of such a school is to be determined under state law, the center is an institution established under federal law and is not a 'secondary school' under state law."

compensation paid under Section 610–1 of the Economic Opportunity Act (sometimes referred to later as EOA).

■ At the threshold, we note that the meaning of the Economic Opportunity Act with regard to the salaries that may be legally paid for Job Corps work is not completely clear from the face of the statute. *See* 42 U.S.C.A. § 2951, *supra* note 3. We should also add that the legislative history is silent or unclear, and that there is no case law precisely on point. *See* H.R.Rep.No.866, 90th Cong., 1st Sess. (1967); S.Rep.No.563, 90th Cong., 1st Sess. (1967). In reasonably construing the Economic Opportunity Act we must look to its purpose, to the purpose of the Fair Labor Standards Act, to the overall fairness of the provisions in question, and to parallel action taken by Congress with regard to both Acts in question.

■ Plaintiff "advisers" rest their case principally on the phrase "rate of compensation" in 610–1(a), asserting that "rate" means hourly rate and not annual rate of compensation. If the assertion is correct, then plaintiffs argue that they may be paid at the hourly overtime level prescribed by the Fair Labor Standards Act and still not "receive compensation at a rate which is . . . in excess of the average rate of compensation paid in the area where the program is carried out to a substantial number of the persons providing substantially comparable services, or in excess of the average rate of compensation paid to a substantial number of the persons providing substantially comparable services in the area of the person's immediately preceding employment, whichever is higher . . .." 42 U.S.C.A. § 2951 (a) (1).

We conclude that the statute has a different intent and that 610–1(a) has a different meaning. The phrase "rate of compensation" is used only twice in Section 610–1, once in 610–1(a), and again in 610–1(c). In both instances the phrase "rate of compensation" has reference to the maximum allowable compensation under the Job Corps programs, 42 U.S.C.A. § 2951, *supra* note 3. In Section 610–1(c) the phrase "rate of compensation" and the word "salary" are used as equivalents. It appears to this court that the only consistent use of the phrase on which appellant advisers rest their cases connotes a meaning directly contrary to that which the advisers would attach. "Rate of compensation" seems to have consistent reference to yearly compensation, not to hourly compensation.

In addition, we note that 610–1(a) (1) and 610–1(a) (2) denote the maximum and minimum payments, respectively, allowable under the Economic Opportunity Act in different terms: "rate of compensation" for the maximum, "minimum wage rate prescribed in section 206(a) (1) of Title 29 [the Fair Labor Standards Act, Section 6]" for the minimum. While it is quite possible that Congress simply did not anticipate the precise nature of this litigation and did not draft these sections of the Economic Opportunity Act accordingly, we feel that the cast of 610–1(a) leads to two conclusions.

■ First, 610–1(a) by its terms prescribes an hourly minimum and yearly maximum. In setting the minimum rates under the Economic Opportunity Act, Congress specifically used the term "wage," generally associated with hourly payments of compensation. We note also that "wage" is used only once in Section 610–1, contrasted to the uses of "rate" that run counter to the advisers' position. In addition, Congress took some pain to include Section 6 of the Fair Labor Standards Act specifically within the provision of the *minimum* wage rate acceptable under the Economic Opportunity Act, but did not include specifically Section 7 of the Fair Labor Standards Act within the provisions regarding *maximum* rates of compensation under the Economic Opportunity Act. It appears to this court that if Congress had intended the maximum payments prescribed by 610–1(a) (1) to be hourly wage rates as set forth in Section 7 of the Fair Labor Standards Act, it would

have been a rather simple matter and an obvious parallelism to set that fact out in haec verba in the statute, as was specifically done with regard to the minimum in 610–1(a) (2).

■ Second, we conclude that the Economic Opportunity Act does not include any of the Fair Labor Standards Act wage provisions except that specifically enumerated in 610–1(a) (2). The purpose of the Economic Opportunity Act " . . . is to assist young persons who need and can benefit from an unusually intensive program, operated in a group setting, to become more responsible, employable, and productive citizens; and to do so in a way that contributes, where feasible, to the development of National, State, and community resources, and to the development and dissemination of techniques for working with the disadvantaged that can be widely utilized by public and private institutions and agencies." 42 U.S.C.A. § 2711. The purpose of the Fair Labor Standards Act is " . . . to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce." Brooklyn Savings Bank v. O'Neil, 1945, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296, reh. denied, 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005. While the two purposes are not facially incompatible, a number of factors compel us to conclude that Congress intended the compensation provisions of the Economic Opportunity Act to stand on their own, without any propping by the Fair Labor Standards Act.

■ It appears to this court that the maximum compensation provision of EOA 610–1(a) (2) is in conflict with the plaintiffs' claim under FLSA 7, the "overtime" provision. We shall assume that the plaintiffs' claims are cognizable under the Fair Labor Standards Act independent of the fact that they wish to apply the FLSA to the Economic Opportunity Act.[5] To tender to the advisers their demanded "overtime" would be to compensate them at a "rate of compensation" greater than that allowed by Section 610–1(a) (2) of the Economic Opportunity Act, exceeding the allowable maximums in these cases by roughly double. Where provisions of two Acts are in conflict, standard statutory construction requires that a court adopt as controlling that provision more closely associated with the specific substance of the controversy. See Panama Canal Co. v. Anderson, 5 Cir. 1963, 312 F.2d 98. Compare Powell v. United States Cartridge Co., 1949, 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017, where the Supreme Court held that there was no conflict in overlapping provisions in the Walsh-Healey Act and the Fair Labor Standards Act, where both provisions prescribed *minimum* wages. The Walsh-Healey Act, which admittedly covered the defendant contractors, prescribed minimum wages equal to the "prevailing wage" of the community, while the Fair Labor Standards Act, passed after Walsh-Healey, prescribed specific minimum wage levels that were higher than those "prevailing" in the community. The contractor argued that the two provisions were mutually exclusive, and that, following usual statutory construction, the Walsh-Healey Act, as the statute most directly concerned with the contractors, should be taken as the law regarding minimum wages. The Court disagreed, explaining:

"There has been no presentation of instances . . . where compliance with one Act makes it impossible to comply with the other. There has been no demonstration of the impossi-

---

5. The Foundation argues in the alternative that the Job Corps program in question does not fall within the provisions of the Fair Labor Standards Act for reasons enumerated in the order of the district judge, *supra* note 4. In addition, the Foundation indicated below its intention, if its motion for summary judgment were denied, to argue that the advisers fall within the "white collar exemption" to the Fair Labor Standards Act. 42 U.S.C.A. § 213. We do not find it necessary to reach either argument.

bility of determining, in each instance, the respective wage requirements under each Act and then applying the higher requirement as satisfying both."

339 U.S. at 519, 70 S.Ct. at 766. We are convinced that in the case of the Job Corps advisers there *are* instances "where compliance with one Act makes it impossible to comply with the other." That impossibility stems from the fact that EOA 610–1(a) (1) sets a maximum "rate of compensation" or salary at a level equal only to that prevailing in the area for similar work or equal to that prevailing in the area from which the applicant was employed immediately prior to his or her Job Corps service. It is clear from the plaintiff advisers' requests in this case that a strict compliance with Section 7 of the Fair Labor Standards Act would violate our understanding of EOA 610–1(a) (1). Under these circumstances we are compelled to conclude that EOA 610–1 is the sole controlling provision for Job Corps compensatory standards. That EOA provision includes by designation Section 6 of the FLSA as its minimum, but it does not thereby drag Section 7 into the maximum provisions. It is the conclusion of this court that the Economic Opportunity Act sets its own compensatory standards, outside the cross-current of the Fair Labor Standards Act.

Our conclusion is buttressed by the fact that the 1966 amendments to the Economic Opportunity Act, which added Section 610–1, were considered and passed by the same committees in Congress that also considered the 1966 amendments to the Fair Labor Standards Act, which extended the coverage provisions of the FLSA. 29 U.S.C.A. § 203(r). The conference bills regarding both the EOA and the FLSA passed the House and the Senate within a period of five weeks. 112 Cong. Record 21949, 22669, 28179, 27369. It appears to this court that had Congress intended the Job Corps to be governed by the entirety of the Fair Labor Standards Act and particularly by Section 7, Congressional committees would have so stated in reporting the 1966 amendments, since the Fair Labor Standards Act was quite obviously before the same committees. We find in this omission an intent to allow the Job Corps programs under the Economic Opportunity Act to set their own rates of compensation in compliance with Section 610–1 of the EOA.

■■ The experience of the courts in construing the Fair Labor Standards Act has not been an altogether happy one. *See* Jewell Ridge Coal Corp. v. Local No. 6167 United Mine Workers, 1944, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534; Anderson v. Mt. Clemens Pottery Co., 1945, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515; Bay Ridge Operating Co. v. Aaron, 1947, 334 U.S. 446, 68 S.Ct. 1186, 92 L.Ed. 1502; Brooklyn Savings Bank v. O'Neil, *supra*; Farmers Reservoir & Irrigation Co. v. McComb, 1948, 337 U.S. 755, 69 S.Ct. 1274, 93 L. Ed. 1672; Portal-to-Portal Act of 1947, 29 U.S.C.A. § 251 et seq.; Fair Labor Standards Amendments of 1949, 29 U.S. C.A. §§ 202–208, 211–217. We find ourselves in agreement with Mr. Justice Frankfurter that the Fair Labor Standards Act " . . . is not to be stretched to the extent that sophistical argumentation can stretch its scope but is to be applied in a commensensical way." Powell v. United States Cartridge, 339 U.S. at 523, 70 S.Ct. at 769 (Frankfurter, J., dissenting). It was the purpose of the Economic Opportunity Act to conduct the "War on Poverty," not to regulate commercial relationships. Of course, any administrative system must provide compensation for those who work within it, but Congress clearly has the power to choose that an internal compensatory system be sui generis in whole or in part and not ruled by the entirety of the Fair Labor Standards Act. We conclude that the fairest and most reasonable construction of the compensation provision of the Economic Opportunity Act is that Section 610–1 determines compensation for Job Corps employees without the implied incorporation of Section 7 of the Fair Labor Standards Act. Within the

perimeters of Section 610–1, the Director of the Job Corps may set the compensation levels of those within the Job Corps programs, and a court cannot presume to read into that express authority to determine levels of compensation a requirement that the Director abide by the commercially regulatory provisions of Section 7 of the FLSA. We have taken the contrapuntal approach to this case not because the trial court's symphonies of decision are necessarily disharmonious as contra-indicative, but simply because we believe that Congress, as the caller of compensatory tunes, could have but did not command itself to pay its quasi-somnolent pipers as though they were commercial musicians. The lower court's granting of the Foundation's motion for summary judgment is affirmed.

Affirmed.