Rory BROWN, Thomas G. Douglas,
Michael W. Oswald, Plaintiffs,

v.

CONSOLIDATED RAIL
CORPORATION,
Defendant.

No. C79–1230.

United States District Court,
N.D. Ohio, E.D.

Jan. 16, 1985.

Marcia W. Johnson, Asst. U.S. Atty., Mary Anne Garvey, Cleveland, Ohio, U.S. Dept. of Justice, Dept. of Labor, Washington, D.C., for plaintiffs.

Thomas R. Skulina, Riemer, Oberdank & Skulina, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

This matter is before the Court on cross-motions for summary judgment. Under well-settled rules, the Court may grant summary judgment only if one of the moving parties has proven that it is entitled to summary judgment as a matter of law upon facts to which no genuine issue of materiality exists. For the reasons set forth below, the Court grants partial summary judgment for the plaintiffs in this action.

### I.

The above-captioned case was commenced by the plaintiffs under the Vietnam Veteran's Readjustment Assistance Act of 1974, 38 U.S.C. § 2021 *et seq.*, (the Readjustment Act) to recover sums allegedly due them from the defendant. The action has been filed on behalf of the plaintiffs by the United States Attorney for the Northern District of Ohio in accordance with 38 U.S.C. § 2022.

The plaintiffs were all employed by the Erie-Lackawanna Railroad (the railroad) in non-temporary positions. Plaintiff Rory Brown was first hired by the railroad in April, 1970 as a trackman, but left on October 23, 1970 upon his induction into military service. Mr. Brown received an honorable discharge from the Air Force on June 29, 1974 and thereafter made a timely application for reemployment with the railroad. Upon his rehire, he subsequently was promoted to Track Foreman and was awarded a retroactive seniority date in the latter position of August 23, 1971.

Plaintiff Thomas Douglas first worked for the Erie-Lackawanna Railroad in June 1966. On August 15, 1966, Douglas left his position as an Electrician's Helper to enter the Air Force. Upon his honorable discharge from the Air Force on July 13, 1970, Mr. Douglas also made a timely application for re-employment with his employer and was reinstated in August 1970. He began his re-employment as an Electrician's Apprentice and upon the completion of the apprenticeship was promoted to the position of a Journeyman Electrician (Mechanic) in December 1975. He was then given a retroactive seniority date in that position of March 30, 1971.

Plaintiff Michael Oswald was originally hired by the railroad in March 1966. On January 30, 1969, Mr. Oswald entered the Air Force after leaving his position with his employer as an Electrician's Helper. Mr. Oswald received an honorable discharge from the Air Force on November 2, 1970 and was reinstated by the railroad that same month. He began his reemployment as an Electrician's Apprentice and was eventually promoted to the position of Journeyman Electrician in June 1975. Thereafter he received a retroactive seniority date of February 15, 1971.

The Erie-Lackawanna Railroad, plaintiffs' employer, was one of a number of bankrupt railroads whose operations were taken over by a government-chartered corporation, the Consolidated Rail Corporation (Conrail), pursuant to the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 *et seq.,* (the Regional Rail Act). In incorporating Conrail, Congress established a system of hiring for the railroad that dovetailed the seniority of the employees of the affected railroads and a fund which sought to provide financial protection for certain employees of the predecessor railroads which had been combined to form Conrail. Among the protections to be afforded the employees was a monthly displacement allowance (MDA), 45 U.S.C. § 775(b). The MDA was available to eligible protected employees, who either did not qualify due to their seniority for any position with Conrail or whose hours or positions were curtailed or lowered on account of others having higher priorities regarding seniority and rights to a new position. The plaintiffs qualified as such for MDA's.

The amount of the MDA was determined by a statutory formula which was originally contingent upon the total compensation of the affected employee. The total compensation considered was to include vacation allowances and monthly compensation guarantees received during the last twelve calendar months prior to the time the employee was adversely affected. In order to qualify as a "countable" 12-month period, the employee had to work more than 50% of his or her normal work schedule in each of the twelve months. The formula was later changed to one relying upon total compensation received during the twelve full calendar months immediately preceding February 26, 1975 and was finally amended to include compensation earned in the twelve months prior to January 1, 1975 (the uniform test period).

Each of the plaintiffs was paid according to the statutory formula. Plaintiff Brown's MDA was computed based on his actual earnings during his last seven months prior to his departure for the military, April 1970 to October 1970, and the first five months following his return, August 1974 to December 1974. Plaintiff Oswald's MDA was calculated on the basis of the compensation he actually earned during the uniform test period, from February 1974 to January 1975. Plaintiff Douglas's MDA was also based on his actual wages earned during the uniform test period.

## II.

In moving for summary judgment, defendant asserts that the plaintiffs have failed to exhaust their administrative remedies under the Regional Rail Act and the Railway Labor Act, 45 U.S.C. § 151 *et seq.,* and as such that this Court lacks jurisdiction to hear the matter.

Pursuant to 45 U.S.C. § 777, any "dispute or controversy with respect to the interpretation, application, or enforcement"

of the provisions of the Regional Rail Act are to be submitted to an Adjustment Board for a final and binding decision as provided for in the Railway Labor Act, 45 U.S.C. § 153 Second. The Railway Labor Act was created by Congress "to promote stability in labor-management relations ... by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective bargaining agreements." *Union Pacific Railroad Co. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978). Its provisions establish the exclusive procedures under which an employee or employer in the covered industry may seek review of disputes governed by the Act. In enacting the statute, Congress sought to create a forum in which the special problems arising out of railroad management could be determined by individuals with widespread knowledge in the railroad field.

When Congress chartered the Consolidated Rail Corporation and merged various carriers into the new entity, it chose to create and call upon an Adjustment Board operating pursuant to the Railway Labor Act and the mandatory arbitration procedures provided therein to resolve disputes arising from all collective bargaining agreements covering the constituent parts of the new Conrail system. *See Local 194 C & T v. Consolidated Rail Corporation*, 672 F.2d 621, 625 (7th Cir.1982). The defendant here argues that the plaintiffs' complaint represents the type of dispute that was meant to be covered by 45 U.S.C. § 777 and that this Court is without jurisdiction to hear this matter. A careful reading of the two statutes and the relevant case law persuades the Court, however, that it does in fact possess primary jurisdiction over the dispute involved herein.

■ Defendant argues that this matter involves a dispute with respect to the interpretation of 45 U.S.C. § 775(b), namely whether the computation of monies received in determining plaintiffs' MDA should take account of the time the plaintiffs spent in the military. Defendant fails

however to realize that plaintiffs are not seeking rights granted to them under the collective bargaining agreements entered into pursuant to the enactment of the Regional Rail Act. Rather, the plaintiffs seek judgment under a federal statute providing for important rights granted to those who faithfully served their country in time of war.

This very issue was addressed and decided in favor of direct access to a federal judicial forum by the U.S. Supreme Court in *McKinney v. Missouri-Kansas-Texas Railroad Co.*, 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1958). In that case, plaintiff sued to obtain an earlier seniority date for his position with defendant railroad based on his contention that he would have obtained the position sooner had he not entered the military during the Korean War. In defending the suit, the railroad argued that the rights plaintiff asserted, to bid for a job posted during his absence, were governed by a collective bargaining agreement to which plaintiff's union was a signatory and which obligated employees to pursue their grievance before the National Rail Adjustment Board under 45 U.S.C. § 153.

The Supreme Court rejected such an interpretation. Although recognizing that the proper determination of the rights asserted by the plaintiff might necessarily involve interpretation of the collective bargaining agreement, the Court held that the rights alleged were created by a federal statute. The plaintiff therefore sued as a veteran for special rights created by federal policy and not as an employee under a collective bargaining act; as such, he was not to be forced to go through administrative procedures.

■ The matter before the Court is in fact almost identical to that which faced the court in *Kidder v. Eastern Air Lines, Inc.*, 469 F.Supp. 1060 (S.D.Fla.1978). There the plaintiff sued for holiday pay allegedly due on account of his absence from work due to military service. In response to the claim that the Railway Labor Act conveyed exclusive jurisdiction over the dispute to the Adjustment Board, the

court held that the plaintiff did not seek the interpretation of a contract provision but rather claimed a remedy expressly granted by the Readjustment Act, a remedy that required construction by a federal court of the federal law in the context of a clear contract provision. The plaintiff was permitted to pursue his remedy before the court.[1] The fact that 45 U.S.C. § 777 addresses arbitration in the context of the Regional Rail Act adds nothing to defendant's argument. As previously discussed, the Regional Rail Act utilized and affirmed private collective bargaining agreements in its enactment. A reading of the legislative history of the Regional Rail Act reveals absolutely no indication that 45 U.S.C. § 777 was intended in any way to repeal or overlay the rights and procedures contained in the Readjustment Act. When two statutes are alleged to conflict it is a cardinal principle that the more specific grant of jurisdiction will prevail. *See Moe v. Eastern Airlines, Inc.,* 246 F.2d 215 (5th Cir. 1957), *cert. denied,* 357 U.S. 936, 78 S.Ct. 1380, 2 L.Ed.2d 1550 (1958); *Armstrong v. Baker,* 394 F.Supp. 1380 (N.D.W.Va.1975).[2]

### III.

The Vietnam Veteran's Readjustment Assistance Act of 1974 constitutes the most recent recodification of the Selective Training and Service Act of 1940, ch. 720, § 8, 54 Stat. 890 (1940) (hereinafter referred to as the "Selective Service Act"). The Selective Service Act, the nation's first program for peacetime conscription, was enacted in preparation for World War II, and con-tained provisions to mitigate the disruptive effects to the economy that were likely to occur with the completion of compulsory military service. To that end, the Selective Service Act provided that qualifying returning veterans were to be given the status and positions that they occupied prior to their entry into military service.

The protections afforded veterans who served in the military during the Vietnam War are codified in 38 U.S.C. § 2021. The statute provides in pertinent part:

Right to reemployment of inducted persons; benefits protected

(a) In the case of any person who is inducted into the Armed Forces of the United States under the Military Selective Service Act (or under any prior or subsequent corresponding law) for training and service and who leaves a position (other than a temporary position) in the employ of any employer in order to perform such training and service, and (1) receives a certificate described in section 9(a) of the Military Selective Service Act (relating to the satisfactory completion of military service), and (2) makes application for reemployment within ninety days after such person is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—...

(B) if such position was in the employ of a State, or political subdivision thereof, or a private employer, such person shall—

---

1. *See also Healen v. Eastern Airlines, Inc.,* 9 Empl.Prac.Dec. ¶ 10,023 (N.D.Ga.1973). In *Healen,* plaintiff alleged a violation of Title VII, 42 U.S.C. § 2000e *et seq.,* in the denial of seniority accrual during maternity leave. The defendant asserted that the denial was compelled by the collective bargaining agreement to which plaintiff was a party and that the dispute was subject to mandatory arbitration under the Railway Labor Act. The Court rejected defendant's argument, finding that the rights asserted by the plaintiff were rights flowing directly from a federal civil rights statute and not from a collective bargaining agreement. As such, the Court held that deferral was unwarranted and would only serve to deny plaintiff her specific federal rights.

2. A similar and related principle of statutory interpretation is that "repeals by implication are not favored." *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976). 38 U.S.C. § 2021 has been part of the law for many years. To assume that the enactment of the Regional Rail Act repealed the provisions of the various Veteran's Acts in instances where our nation's veterans seek their rights as employees of the railroads, without any showing that Congress so intended, is contrary to this "cardinal principal" of construction. *Id.* at 154, 96 S.Ct. at 1993.

(i) if still qualified to perform the duties of such position, be restored by such employer or his successor in interest to such position or to a position of like seniority, status, and pay: ...

(b)(2) It is hereby declared to be the sense of the Congress that any person who is restored to or employed in a position in accordance with the provisions of clause (A) or (B) of subsection (a) of this section should be so restored or remployed in such manner as to give such person such status in his employment as he would have enjoyed if such person had continued in such employment continuously from the time of such person's entering the Armed Forces until the time of such person's restoration to such employment, or reemployment.

The Readjustment Act serves a "very important but limited purpose [—] to assure that those changes and advancements in status that would necessarily have occurred simply by virtue of continued employment will not be denied the veteran because of absence in the military service." *McKinney v. Missouri-Kansas Texas Railroad Co.*, 357 U.S. 265, 272, 78 S.Ct. 1222, 1226, 2 L.Ed.2d 1305 (1958). The Supreme Court has repeatedly emphasized from its first encounter with the Selective Service Act that courts should construe the legislation liberally in an effort to benefit those who have left private life to serve their country. *See Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946). More recently, the Supreme Court has noted its belief that the courts must apply the words of the Selective Service Act in a manner to effectuate the Congressional intent, stating that the "requirements of the 1940 Act are not satisfied by giving returning veterans seniority in some general abstract sense and then denying them the perquisites and benefits that flow from it." *Accardi v. Pennsylvania Railroad Co.*, 383 U.S. 225, 230, 86 S.Ct. 768, 771, 15 L.Ed.2d 717 (1966).[3] It is from this focus

that the Court must now examine the instant matter.

## IV.

Less clear than the Congressional intent behind the Selective Service Act is the proper means to define whether a benefit or advancement claimed by a returning veteran is a right associated with seniority. The Supreme Court has identified two methods of analysis to evaluate the issue:

If the benefit would have accrued, with reasonable certainty, had the veteran been continuously employed by the private employer, and if it is in the nature of a reward for length of service, it is a 'perquisite of seniority'. If, on the other hand, the veteran's right to the benefit at the time he entered the military was subject to a significant contingency, or if the benefit is in the nature of short term compensation for services rendered, it is not an aspect of seniority within the coverage of [the Selective Service Act].

*Alabama Power Co. v. Davis*, 431 U.S. 581, 589, 97 S.Ct. 2002, 2007, 52 L.Ed.2d 595 (1977).

It has been noted by both courts and commentators that the tests enunciated and applied by the Supreme Court have failed to produce clear and consistent guides to decision. *See, e.g., Goggin v. Lincoln St. Louis*, 702 F.2d 698 (8th Cir. 1983); Haggard, Veterans' Reemployment Rights and the "Escalator Principle," 51 B.U.L.Rev. 539 (1971). Given the vagueness of the statutory language, any criticism is better directed at Congress. For four decades Congress has been aware of the questions facing the courts concerning the proper scope of the statute, but has failed to make any changes in the Selective Service Act, preferring instead to leave interpretation of the statute to the courts on a case-by-case basis.

Therefore, the Court must now attempt to determine whether the MDA's claimed by plaintiffs are "perquisites of seniority"

---

**3.** *See also Barrett v. Grand Trunk Western Railroad Co.*, 581 F.2d 132 (7th Cir.1978).

in light of Supreme Court precedents and reasoning.

## A.

The first half of the *Alabama Power* test asks whether a claimed benefit would have accrued with reasonable certainty had the veteran been continuously employed by the private employer or, on the other hand, if the right to the benefit was subject to a significant contingency at the time he entered the military. If the benefit is of the former variety, then it may qualify as a "perquisite of seniority."

In the instant matter, the plaintiffs left the employ of the Erie-Lackawanna for service in the military at a time when they were serving in apprenticeship positions. Upon their reemployment with the railroad, they were reinstated in their previous positions. They then completed the apprenticeship requirements and upon fulfillment of such requirements were advanced to new positions. Upon advancement, each plaintiff was given a retroactive seniority date for his new position.

 The "reasonable certainty" test asks if the claimed benefit would have likely accrued to the veteran merely by passage of time in continuous employment or if the position claimed required a level of skill or advancement such that promotion is discretionary with the employer. *Compare Bassett v. Texas Pacific Railway Co.,* 258 F.2d 819 (5th Cir.1958) *with Beard v. Norfolk & Western Railway Co.,* 484 F.Supp. 758 (W.D.Va.1980). However, reasonable certainty need not be determined at the outset but rather can be judged by plaintiff's employment history both prior to and after completion of his military service. *Alabama Power Co. v. Davis,* 431 U.S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977); *Almond v. United States Steel Corp.,* 499 F.Supp. 786 (E.D.Pa.1980).

In response to Requests for Admission proffered by the plaintiffs, defendant admitted that "retroactive seniority dates were awarded in recognition of the fact that, if it had not been for their periods of absence in military service, plaintiffs would have achieved the positions in question on (or about) such dates." However, in its later-filed motion for summary judgment, defendant argued, without supporting affidavit or explanation, that plaintiffs' promotions "were discretionary promotions ·encumbant upon ability and time in grade."

The Court deems defendant's admission to be binding for the purposes of this litigation pursuant to Federal Rule of Civil Procedure 36, and thus concludes that plaintiffs have satisfied the "reasonable certainty" requirement of the *Alabama Power Co.* test. Defendant has given the Court no reasons or facts to permit withdrawal or amendment of its admission. *See, e.g., United States v. Cannon,* 363 F.Supp. 1045 (D.Del.1973). Indeed, defendant has not even affirmatively requested that the Court permit such a motion. Rather, it has made a single undocumented and unexplained assertion in its brief urging the Court to find that plaintiffs' promotions, which they received and for which they were given retroactive seniority dates, were not a reasonable certainty at the time they entered into the military. The Court therefore holds that plaintiffs have met their burden in proving a reasonable certainty to their promotions.

## B.

The second prong of the *Alabama Power Co.* test asks whether the claimed benefit is in the nature of a reward for length and continuity of service or if it is in the nature of short term compensation for services rendered, the former being considered "seniority" within the meaning of the Readjustment Act.

The Courts have been called upon to construe and apply this part of the *Alabama Power Co.* test when considering whether veterans are entitled to company pensions and to the various layoff protection programs. As is the case with the vast majority of benefits sought by veterans under the provisions of the Selective Service Act, the demarcation between a benefit being a reward for length of ser-

vice or being deferred short-term compensation is not clear. *Smith v. Industrial Employers & Distributors Association*, 546 F.2d 314 (9th Cir.1976). For instance, pension plans and the level of benefits due under them have been deemed to be rewards for length of service of an employee with a single employer, *see, e.g., Alabama Power Co. v. Davis*, 431 U.S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977); *Schell v. Ohio Highway Patrol*, 95 Lab.Cas. ¶ 13,887 (S.D. Ohio 1982). The availability of retirement with a pension promotes longevity and a stable work force, allowing greater productivity for the employer. However, it cannot be denied that the funding of pension plans and lay-off protection programs is a current cost to the employer and that pensions can be viewed as deferred compensation for work previously performed.

In evaluating various benefit entitlements, the Supreme Court has used two avenues of inquiry. First, the Court has examined the means by which benefits are calculated in an effort to determine whether the amount of the benefit is directly related to the work performed by the employee. If the relationship is direct, then the Court is more likely to deem the benefit at issue short-term compensation for work actually performed. Second, the Court has attempted to examine the "true nature" of the benefit at issue.

For example, in *Coffy v. Republic Steel Corp.*, 447 U.S. 191, 100 S.Ct. 2100, 65 L.Ed.2d 53 (1980), the Supreme Court considered whether supplemental unemployment benefits provided to steelworkers pursuant to an industry-wide collective bargaining agreement were "perquisites of seniority." Under a provision in the steel industry agreement, workers were to receive weekly benefits while they experienced periods of lay-off. The amount of the benefit was determined by the hourly wage rate prior to lay-off, the number of dependents, the amount of state unemployment compensation received, and the level of funding remaining in the plan. The length of receipt of benefits was tied to the number of credits an employee had accumulated prior to lay-off. One credit was received for each week an employee worked or received pay for hours not worked, as in the case of vacation or performance of union duties. Employees received benefits only after completing two years of continuous service before being laid off. After two years of continuous service, an employee received one week of benefits for each credit accumulated. At any time, a maximum of 52 weeks of benefits were allowed.

Upon examination, the Supreme Court held that the benefits, with the 52 week cap, were not so proportionate to the hours actually worked that the benefits should be considered compensation for work actually performed. Rather, the Court held that the benefits were meant to assure a stable work force during short-term periods of lay-off and as such were rewards for length of service.

Similarly, in *Accardi v. Pennsylvania Railroad Co.*, 383 U.S. 225, 86 S.Ct. 768, 15 L.Ed.2d 717 (1966), the Supreme Court considered whether severance payments to tugboat firemen were a reward for length of service. According to a provision of a collective bargaining agreement signed by plaintiffs' union and the defendant, the position of fireman on diesel tugboats in New York Harbor was to be abolished, and all those individuals who were thus discharged but had over twenty years seniority were to receive severance pay. The amount of severance pay was determined by the length of "compensated service," which was any month in which the employee worked one or more days. In computing this time, the defendant refused to include the months in which plaintiffs had served in the military during World War II.

Noting that the term "seniority" was to be given a meaning consonant with the intention of Congress as expressed in the Selective Service Act—to preserve the rights and benefits that automatically would have accrued but for leave of absence for military service—the Court concluded that the severance payments at issue were perquisites of seniority. Since a

mere seven days of employment could equal a year of "compensated service", the Court deemed that "compensated service" did not equate with actual total service rendered. The Court found that the real nature of the severance payment was to compensate employees who had worked their entire career with defendant railroad company for the loss of their jobs.

The Court must now examine the monthly displacement allowances at issue in the instant case and how they are calculated. As earlier described, the MDA is determined by computing total compensation received, in the case of plaintiff Brown, during the last twelve calendar months in which he worked more than 50% of his normal work schedule, and in the cases of plaintiffs Oswald and Douglas, on compensation they earned during the uniform test period. The amount of the MDA was in no event to exceed the sum of $2,500 in any month.

The duration of receipt of the displacement allowance varies with whether an employee had five or more years of service with the railroad. If on January 2, 1974 the protected employee had reached his fifth year with his employer, his MDA payments were to continue until his 65th birthday. For employees with less than five years of service, however, the duration of the MDA was not to exceed a period equal to an individual's total prior years of service.

With respect to plaintiff Brown, the Court concludes that the MDA payments were benefits in the nature of a reward for length of service. Eligibility was dependent upon an employee's compensation in any month in which he worked more than 50% of his normal work schedule. Like the situations in *Accardi* and *Coffy* this eligibility requirement does not so clearly equate with actual total service rendered. Since Brown's compensation in any month in which he worked only 49% of his normal work schedule would not have counted to-

wards calculation of his MDA calculation, the MDA cannot be said to equal total service.

The calculation of the MDA under the uniform test period for plaintiffs Oswald and Douglas presents slightly different considerations, since the MDA's thus received would bear a greater relationship to actual total service rendered. The Court's inquiry cannot stop at this point, however, but rather must proceed to determine the "true nature" of the benefit received.

The MDA's at issue could not exceed $2,500 per month. Such a cap belies the view that MDA's are short term compensation for actual work performed. Similarly, the duration of MDA's is more akin to a pension benefit than to compensation. For example, an employee with five years of service might receive MDA's for forty years, assuming he started with the railroad in 1969 at the age of twenty, whereas an employee of the same age starting in 1970 would receive only four years of MDA payments.[4] This "vesting" characteristic of MDA's undercuts the notion that MDA's are short term compensation for work actually performed.

Most importantly, the Court must examine what purpose MDA's were meant to serve. The MDA's served as a level of protection for railroad employees with sufficient seniority to remain in the employ of Conrail but with insufficient seniority to obtain an actual position of employment with the railroad.

■ In sum, the Court concludes that MDA's are benefits in the nature of rewards for length of service. The similarity of MDA's to the benefits described by the Supreme Court in its most recent examination of the Service Act in *Coffy* convinces this Court that MDA's are governed by the Readjustment Act.

## V.

Finally, defendant has raised during oral argument an issue that must be addressed

---

**4.** It should be noted that the part of the Regional Rail Act providing for MDA's has since been repealed. This fact, however, has no bearing on the characterization of the benefit as originally created.

by the Court. Defendant claims that irrespective of whether the MDA's could properly be classified as "perquisites of seniority" the MDA's are not covered by the Readjustment Act. Defendant suggests that plaintiffs' MDA's were calculated in accordance with the formula explicitly authorized by Congress in the Regional Rail Act. Defendant implies that the rights accorded by the Readjustment Act pertain solely to benefits created by private contract or agreement and that where a benefit is created by statute the Readjustment Act does not apply.

The Court rejects defendant's broad statement. Indeed, in an analogous situation concerning the computation of pensions for state highway patrol officers, the United States District Court for the Southern District of Ohio held that the plaintiff's pension had to be calculated to include the amount he would have been entitled to had he not left the highway patrol to serve in the military. *Schell v. Ohio Highway Patrol*, 95 Lab.Cas. ¶ 13,887 (S.D.Ohio 1982). When faced with the argument of defendant that it had calculated plaintiff's pension in accordance with the statutory formula mandated by Ohio Revised Code § 5505 and that any other sum would be barred by the state statute, the court stated that to the extent that the state statute resulted in a denial of benefits the state statute was preempted by the Readjustment Act.

The question facing this Court, however, is not one of preemption but rather one of statutory interpretation—whether Congress, in enacting the Regional Rail Act and providing for MDA's for adversely affected railroad employees, intended the formula it created to be applied without the protections of the Selective Service Act.

A review of the legislative history of the Selective Service Act and its recodifications and of the Regional Rail Act is unfortunately of little assistance. The major concern of Congress in drafting the two statutes was not the calculation of veterans' benefits or MDA's but rather the creation of a national conscription program and the restructuring of the railroad freight system in the Eastern United States, respectively. Nowhere in the legislative history of either statute does Congress address the substantive questions in calculating benefits. Thus, the Court must attempt to discern whether Congress intended for the Readjustment Act to be inapplicable to the Regional Rail Act through other means.

Defendant argues that Congress intended that the Selective Service Act apply only to seniority systems established in private contractual agreements. Although Congress was aware of their existence of seniority systems and seniority rights when it passed the Service Act, *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 288, 66 S.Ct. 1105, 1112, 90 L.Ed. 1230 (1976), there is no indication that Congress intended that the sole target of the Selective Service Act were benefits provided within collective bargaining agreements. Such a conclusion is bolstered by the decision of the district court in *Schell v. Ohio Highway Patrol, supra*.

It is a commonly-stated maxim that remedial legislation, such as the Readjustment Act and the Regional Rail Act, should be construed broadly to effectuate the purposes for which they were enacted. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). This does not mean, however, that a court should attach to a statute an objective or result which would negate the limits clearly intended by Congress to be placed on a particular piece of legislation. *United States v. Sisson*, 399 U.S. 267, 298, 90 S.Ct. 2117, 2134, 26 L.Ed.2d 608 (1970); *United Shoe Workers of America, AFL–CIO v. Bedell*, 506 F.2d 174 (D.C.Cir.1974); *Bowman v. Texas Educational Foundation, Inc.*, 454 F.2d 1097 (5th Cir.1972). If two statutes concern the same subject and result in a conflict, a court should attempt to harmonize the two if possible, but upon a failure to do so a court should find applicable the more specific or later-enacted statute. *Panama Canal Company v. Compania Nacional de Navegacion, S.A.*, 463 F.Supp. 330 (D.C.Canal Zone 1978). However, if two statutes serve distinct pur-

poses, the later legislation should not be construed to modify, repeal, or supplant the older statute. *Gray v. Benson,* 443 F.Supp. 1284 (D.Kan.1978). "Legislation of a particular legislative body should not be construed, absent an intent to repeal, such that the benefits conferred by one statute are taken away by another." *Securities and Exchange Commission v. C.H. Wagner & Co., Inc.,* 373 F.Supp. 1214, 1220 (D.Mass.1974).

In the instant matter, the benefits conferred upon veterans by the Selective Service Act and its successors have been deemed a vital concern of the Congress: Congress has included the benefits provision in every recodification of the statute. In addition, the courts have attempted to give meaning to the provision in each instance in which the statute has been construed. Although it is true that the purpose of the Selective Service Act is limited and that the Act is not intended as a panacea for every economic woe suffered by returning veterans, this limitation does not mean that the legitimate purposes of the Selective Service Act are any less important. The plaintiffs in this case served their country honorably in time of war. In so doing, they were uprooted from their positions of employment and had their promotion patterns disrupted so that upon their return to civilian life they found themselves in positions junior and at salaries lower than what they would have been had they not served in the military.

When the Eastern railroads, including plaintiffs' employer, suffered bankruptcy, Congress, in recognition of the importance of rail transport to the nation's economy, restructured the railroads by creating Conrail. The streamlining of the rail system into Conrail entailed that the railroad work force be reduced. To protect those employees whose seniority was not great enough to guarantee them a position in the new Conrail system, Congress created a program of monthly displacement allowances.

The MDA's were to be calculated according to a formula drafted by representatives of the railroads and the unions representing railroad employees. *See* 1973 U.S.Code Cong. & Ad.News 3242, 3295. Defendant stated at oral argument that the formula agreed upon and incorporated in the Regional Rail Act was the choice of the unions because the uniform test period constituted a period of high overtime for the railroad employees. The defendant also argued that to allow the use of the Readjustment Act to further increase plaintiffs' MDA's in the present instance would do an injustice to Conrail.[5]

The Court holds that the provisions of the Readjustment Act require that plaintiff's MDA's be calculated by use of the wages they would have earned had they not experienced a disruption in employment due to military service. The protections afforded by the Selective Service Act continually have been held to override other federal and state legislation. *See, e.g., McKinney v. Missouri-Kansas-Texas Railroad Co.,* 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1958) (Railway Labor Act); *Schell v. Ohio Highway Patrol,* 95 Lab. Cas. ¶ 13,887 (S.D.Ohio 1982). Where a statute is created to afford such protections, the passage of a later piece of legislation that at first glance may be construed to defeat the earlier protections should not be deemed to repeal the earlier conferred benefits.

For instance, in *Securities and Exchange Commission v. C.H. Wagner & Co., Inc.,* 373 F.Supp. 1214 (D.Mass.1974), the court was faced with an argument that the protections afforded customers of securities under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et. seq., were defeated by the defendant brokerage house's filing for protection under the Bankruptcy Act. The court rejected such an argument and held that the customers'

---

**5.** As the Court understands the matter, although the Regional Rail Act provided that MDA's be paid out of a fund created by Congress, the Act was later amended so that Conrail became responsible for the payment of MDA's. In the present case, plaintiffs' contested MDA's are the obligation of Conrail, not the federal government.

claims could go forward under the former statute.

Where, as in the present instance, two statutes serve distinct purposes, a court, rather than attempting to set up an irresolvable conflict between the two pronouncements of Congress, should attempt to reconcile the statutes. *Gray v. Benson,* 443 F.Supp. 1284 (D.Kan.1978). The use of such a method in the instant case requires that plaintiff's MDA's be recomputed to include the earnings he would have received but for their military service. In enacting 45 U.S.C. § 775 as a part of the Regional Rail Act, Congress created a unemployment fund to protect the interests of the employees of the railroads that were merged to form Conrail. The disbursement of the funds was to be made under a system that used seniority as the basis for calculation of the sums owed. That the fund and the MDA's were created by Congressional enactment, and not as a result of collective bargaining between the management of Conrail and the unions representing the railroad workers, is not dispositive of plaintiffs' claims. In passing 45 U.S.C. § 775 Congress was acting in the interests of the railroad employees. Having created a system to save the bankrupt Eastern railroads and thus providing benefits for the shareholders and creditors of the bankrupt railroads, and also to the other sectors of the nation's economy whose viability was dependent upon the continuation of a rail freight system, Congress, through 45 U.S.C. § 775 sought to protect the employees of the rail system by shifting responsibility for payment of the MDA's from the federal treasury to Conrail. Such a requirement should be seen as the forcing of a concession upon Conrail in return for the bail-out of the rail system.

To argue that the Selective Service Act's protections are inapplicable to the Regional Rail Act because Congress (rather than plaintiffs' union) "bargained" for the economic protection afforded by the MDA's is not persuasive. Denying plaintiffs the additional MDA's to which they would be entitled had they not served their nation during the Vietnam War would run afoul of the Supreme Court's pronouncement in *Accardi* that the Service Act's requirements cannot be satisfied by affording returning veterans seniority in the abstract but denying them the concrete benefits that flow from such seniority. *Accardi v. Pennsylvania Railroad Co.,* 383 U.S. 225, 230, 86 S.Ct. 768, 771, 15 L.Ed.2d 717 (1966). This the Court refuses to do.

## VI.

Accordingly, the Court grants plaintiffs' motion for summary judgment on the issue of liability. In its cross-motion for summary judgment, defendant requested that the Court consider plaintiffs' motion individually as to each plaintiff and not to plaintiffs as a group for the reason that plaintiff Brown's case is different from those of plaintiffs Douglas and Oswald. Having made such a request, however, defendant did not state, either explicitly or by any inference whatsoever, what the differences were between the rights asserted by the different plaintiffs. Indeed, a reading of defendant's brief but for the single sentence referred to above reveals that defendant attempted to treat the three cases the same. The Court is not expected to assume the role of an advocate and discern the distinctions in the cases that counsel perhaps could, but did not, make. Therefore, the Court finds that all three plaintiffs have met their burdens of proof in the instant matter and that their motions for summary judgment should be granted.

The plaintiffs are ordered to file a supplemental memorandum setting forth the correct measure of damages in the instant case within thirty (30) days, and defendant shall be given fourteen (14) days to file a response.

IT IS SO ORDERED.