Winston B. LEWY, Plaintiff-Appellant,

v.

SOUTHERN PACIFIC TRANSPORTA-
TION COMPANY,
Defendant-Appellee.

No. 84–6160.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 1985.

Decided Sept. 12, 1986.

Peter Abrahams, Los Angeles, Cal., for plaintiff-appellant.

Ladell Muhlstein, Chase, Rotchford, Drukker & Bogust, Los Angeles, Cal., for defendant-appellee.

Before SCHROEDER and FLETCHER, Circuit Judges, and CARROLL,* District Judge.

FLETCHER, Circuit Judge:

The principal issue in this appeal is whether the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60 (1982), authorizes a railroad employee who has sustained physical and emotional distress injuries in a railroad collision, to recover damages for the aggravation of those injuries resulting from his subsequent, allegedly wrongful discharge. We conclude that it does not.

Winston Lewy, a Southern Pacific Transportation Company employee, was injured in a collision in the company's Los Angeles switching yard, and subsequently was discharged by Southern Pacific for other reasons. Lewy brought an FELA action against Southern Pacific to recover for the injuries he sustained in the collision and for the aggravation of those injuries resulting from his discharge. He appeals a jury award of $15,000.

Lewy challenges the trial court's exclusion of all evidence relating to his discharge by Southern Pacific. He also claims that the trial court erroneously excluded evidence concerning the bias of one of Southern Pacific's witnesses and claims that its jury instructions were repetitive and slanted against him. We have jurisdiction under 28 U.S.C. § 1291 (1982). We conclude that the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188 (1982), precludes courts from awarding the type of discharge-related damages sought by Lewy, and find his other challenges to be without merit. We therefore affirm.

## FACTUAL BACKGROUND

Lewy was injured in March, 1980 when a locomotive he was operating was struck from the rear by a locomotive operated by another Southern Pacific employee. Following the collision, he experienced pain in his head, neck, lower back, and right leg, and was hospitalized for eight days. His back condition appeared to deteriorate over the next year, and he underwent a lumbar laminectomy to remove a portion of his spinal disc tissue in April, 1981. Lewy was hospitalized for two weeks following the surgery. His total medical bills resulting from the accident were $12,665.37.

In August, 1980, when Lewy was convalescing from his original injury, Southern Pacific began to suspect that he was malingering, and ordered him to undergo a physical examination with a company phy-

* Hon. Earl H. Carroll, United States District Judge for the District of Arizona, sitting by designation.

sician. Lewy refused, and Southern Pacific charged him with insubordination and misrepresenting his physical condition, convened a disciplinary hearing, and discharged him in October, 1980. Lewy appealed his dismissal to the National Railroad Adjustment Board (NRAB). In December, 1981, the NRAB ruled that Southern Pacific had introduced irrelevant evidence at Lewy's disciplinary hearing, and had improperly refused to permit two of his treating physicians to testify. The NRAB ordered Lewy to be reinstated based on these procedural errors, expressly noting that it was not ruling on the merits of his claim:

> [I]rrespective of what we might think of the merits or of the Claimant's [Lewy's] testimony, we do not pass thereon. Claimant will be reinstated to service with all rights unimpaired, but without pay for time lost as Claimant has yet to be discharged from [his current treating physician's] care.

Lewy's physician gave him permission to return to work in February 1982, but advised that he should avoid prolonged sitting. As a result, Lewy was prevented from returning to his former position as an engineer, and was limited instead to yard service, a lower-paying job. Before returning to work, however, Lewy was required to pass Southern Pacific's standard rules examination, and he failed it a number of times. He returned to work in September, 1982.

At trial, Southern Pacific introduced evidence that the collision in which Lewy was injured was not very severe, that Lewy had a history of back problems prior to the collision, and that Lewy may have been malingering. The engineer operating the other locomotive in the collision testified that the two trains "didn't hit that hard," and that the collision "was just like coupling into a car." Moreover, Southern Pacific elicited testimony that Lewy had injured his back in a 1964 automobile accident, and that that injury left him unable to play tennis, which he had regularly done up to that time, and resulted in his being ex-

cused from military service. Lewy attempted in his testimony to minimize the severity of his prior back injury, but he was impeached based upon answers to interrogatories he had provided in his personal injury action arising out of the 1964 accident. His sister, Jere Brown, testified that he had consulted her following the 1964 accident concerning whether he should have back surgery, and had specifically told her that he no longer played tennis and could not serve in the military because of his injury. Furthermore, two of Lewy's treating physicians testified that they doubted his veracity concerning his description of his physical condition and suspected him of malingering.

Lewy sought $117,400 in lost wages and benefits, $236,400 in lost future wages and benefits, and $12,665.37 in medical expenses he had incurred. The jury deliberated for two hours, found for Lewy, but awarded him only $15,000. Lewy contends that the jury's low verdict was attributable to three errors by the trial court: (1) its exclusion of evidence relating to his discharge; (2) its exclusion of evidence demonstrating his sister's bias against him; and (3) its slanted jury instructions, which, he claims, overemphasized the possibility that he was contributorily negligent for the collision.

## A. Exclusion of Evidence Relating to Lewy's Discharge

At trial, Lewy testified that following his accident, he developed a fear and anxiety that he would be unable to work and would remain unemployed. He sought to introduce testimony that his "wrongful discharge" by Southern Pacific aggravated this anxiety and emotional anguish, and claimed he was entitled to recover damages for this aggravation of his preexisting emotional condition, based upon the Second Circuit's decision in *Sharkey v. Penn Central Transportation Co.*, 493 F.2d 685 (2d Cir. 1974), which authorized the award of such damages. Southern Pacific filed a pretrial motion to preclude Lewy from introducing any evidence or testimony regarding his

discharge, reinstatement, or resulting damages, maintaining that any claims relating to Lewy's discharge had to be brought under the grievance and arbitral procedures established by the RLA, and therefore, evidence concerning Lewy's discharge would be irrelevant in his FELA action.

The original district judge in this action denied Southern Pacific's motion, and ruled, based upon *Sharkey*, that although the NRAB had "exclusive jurisdiction" to "determine whether [Lewy's] discharge was proper," it had already determined that Lewy was wrongfully discharged, albeit for purely procedural reasons. The judge concluded, therefore, that Lewy was entitled to recover damages under the FELA "for aggravation of [his preexisting emotional] condition due to [the] improper discharge."

A different judge presided at trial. Although he felt compelled to follow this pretrial ruling, he expressed serious doubts about applying *Sharkey*'s principles in Lewy's action. The trial judge noted the extremely complex, almost metaphysical proximate-cause analysis that the jury would be required to undertake under *Sharkey:* they would be required, in effect, to distinguish between the "new" emotional distress caused exclusively by Lewy's discharge, for which they *could not* award damages, and the "aggravation" of Lewy's preexisting emotional distress and anxiety, for which they *could* award damages. Moreover, the trial judge noted that under *Sharkey*, before awarding any discharge-related damages, the jury would also be required to determine whether or not Lewy had "caused" his own discharge by refusing to see Southern Pacific's company physician.

The trial judge ultimately determined that allowing Lewy to advance his aggravation theory would result in "undue delay" and a "confusion of the issues." He therefore excluded evidence relating to Lewy's

discharge under Federal Rule of Evidence 403, and ruled that Lewy could present evidence relating to his emotional distress "attributable only to the accident" itself. Lewy challenges this ruling as an abuse of discretion.[1]

### B. Exclusion of Evidence Relating to Jere Brown's Bias

Jere Brown's testimony concerning the severity of Lewy's 1964 back injury was damaging to Lewy's case. Lewy attempted to impeach Brown by demonstrating that she was biased against him, because he had had her removed as executrix of their father's estate in 1977, supposedly for embezzlement. Lewy's counsel cross-examined Brown extensively about her removal as executrix and the embezzlement charges against her, and even raised the possibility that Brown had contacted Southern Pacific herself and volunteered to testify against Lewy. Lewy testified that there was "bad blood" between him and his sister, that she was "removed as executrix" of their father's estate "because of her inability to handle th[e] estate," and that he was "put in as executor, to investigate her dealings," which "caused a flare-up in [their] relationship."

The trial judge excluded certain testimony under Rule 403 on the "side issue[s]" of whether Brown actually embezzled funds from the estate and whether her share of the estate was ultimately withheld from her. Lewy maintains that the exclusion of this evidence prevented him from effectively establishing Brown's bias and lack of credibility, and therefore constituted an abuse of discretion.

### C. The Trial Court's Jury Instructions

In its jury instructions, the trial court explained the principles of negligence, causation, and contributory negligence, and in-

---

**1.** Because we conclude that the RLA precluded the district court from awarding Lewy damages resulting from his discharge, *see* Analysis, Section B–3, *infra,* we need not review the trial judge's ruling excluding evidence relating to Lewy's discharge under Rule 403. This evidence was simply not relevant in Lewy's FELA action, and therefore should have been excluded under Federal Rule of Evidence 402. *See* Fed. R.Evid. 402.

cluded one final instruction defining causation:

> An injury is caused by an act or omission whenever it appears that the act or omission played any part, no matter how small, in actually bringing about or causing that injury. So if you find from the evidence that any negligence on the part of any party contributed in any way or manner toward any claimed injury or damages, you will find that injury was caused by such act or omission.

Lewy objected to this instruction at trial, and now challenges it on appeal, claiming that it was repetitive and that because it directly followed an instruction on contributory negligence,[2] it "unduly emphasize[d]" Southern Pacific's contention that he was contributorily negligent and that any judgment in his favor should consequently be reduced. Nevertheless, as can be seen, the instruction does not contain the words "plaintiff" or "Lewy," but instead refers merely to the negligence of "any party."

## ANALYSIS

We conclude as a threshold matter that the RLA precludes courts from awarding the type of discharge-related damages

---

**2.** The instruction on contributory negligence that immediately preceded the challenged instruction was as follows:

> Section 3 of the Federal Employer's [sic] Liability Act provides [that] ... the fact that [an injured] employee may have been guilty of contributory negligence shall not bar a recovery but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. So if you should find from a preponderance of the evidence in this case that the defendant was guilty of negligence which caused in whole or in part any injury or damage to the plaintiff, and if you should further find from a preponderance of the evidence in the case that the plaintiff, himself, was guilty of some contributory negligence which contributed toward bringing about all or part of his own injury, then the total award of damages to the plaintiff must be reduced by an amount equal to the percentage of fault or contributory negligence chargeable to the plaintiff.

**3.** The parties originally did not raise the issue of whether the RLA bars Lewy's claim for discharge-related damages in this appeal. However, as noted above, Southern Pacific raised the

---

sought by Lewy in FELA actions. As a result, the evidence relating to Lewy's discharge that he sought to introduce at trial was not relevant to his FELA claims, and should have been excluded under Federal Rule of Evidence 402. *See* Fed.R.Evid. 402 ("[e]vidence which is not relevant is not admissible"). Since we may affirm the trial court's decision on any ground supported by the record,[3] *Lofton v. Heckler,* 781 F.2d 1390, 1392 (9th Cir.1986); *accord Smith v. Block,* 784 F.2d 993, 996 n. 4 (9th Cir.1986); *Bloom v. General Truck Drivers, Office, Food & Warehouse Union, Local 952,* 783 F.2d 1356, 1363 n. 16 (9th Cir.1986), we need not address the merits of the trial court's ruling excluding this evidence under Rule 403.[4] We also conclude that Lewy's remaining challenges to the trial court's judgment are without merit.

### A. Standard of Review

■ We examine de novo any questions relating to the district court's subject-matter jurisdiction under the FELA, or relating to statutory interpretation of the FELA and RLA. *See Davy v. SEC,* 792 F.2d 1418, 1421 (9th Cir.1986) (statutory interpretation); *Pro Sales, Inc. v. Texaco,*

---

issue in a pretrial motion at the district court. Because it relates to whether the district court could exercise subject-matter jurisdiction over Lewy's claim, *see Crusos v. United Transportation Union, Local 1201,* 786 F.2d 970, 972–73 (9th Cir.1986); *see also Jackson v. Consolidated Rail Corp.,* 717 F.2d 1045, 1054–55 (7th Cir. 1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1000, 79 L.Ed.2d 233 (1984); *de la Rosa Sanchez v. Eastern Airlines, Inc.,* 574 F.2d 29, 32 (1st Cir. 1978), we raised the issue *sua sponte* and directed the parties to file supplemental memoranda on the question prior to oral argument. Thus, we have had the benefit of the parties' analyses of the issue in reaching our decision.

**4.** Given our conclusion that the evidence Lewy sought to introduce relating to his discharge was not relevant in his FELA action, Rule 403 would technically not apply to that evidence. Rule 403 provides a basis for excluding "relevant" evidence. *See* Fed.R.Evid. 403. Rule 402 provides the proper mechanism for excluding evidence that is not relevant to the issues in a given action. *See* Fed.R.Evid. 402.

*U.S.A.,* 792 F.2d 1394, 1396 (9th Cir.1986) (subject-matter jurisdiction); *Jones v. Gordon,* 792 F.2d 821, 824 (9th Cir.1986) (subject-matter jurisdiction); *Semar v. Platte Valley Federal Savings & Loan Association,* 791 F.2d 699, 703 (9th Cir.1986) (statutory interpretation).

 We review the trial court's rulings under Federal Rule of Evidence 403 for abuse of discretion. *See Maddox v. City of Los Angeles,* 792 F.2d 1408, 1412 (9th Cir.1986); *United States v. Feldman,* 788 F.2d 544, 557 (9th Cir.1986). Finally, in addressing Lewy's challenge to the trial court's jury instructions, we review the instructions as a whole, in the context of the entire trial, to determine whether they were "'misleading or ... inadequate to guide the jury's deliberations.'" *United States v. Shortt Accountancy Corp.,* 785 F.2d 1448, 1454 (9th Cir.1986), *cert. denied,* ── U.S. ──, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986); *accord Maddox,* 792 F.2d at 1412; *Los Angeles Memorial Coliseum Commission v. National Football League,* 791 F.2d 1356, 1360 (9th Cir.1986); *see Carvalho v. Raybestos-Manhattan, Inc.,* 794 F.2d 454, 455–56 (9th Cir.1986). We may reverse only for an abuse of discretion, and must give the trial judge "substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented." *United States v. Benny,* 786 F.2d 1410, 1416 (9th Cir.1986); *accord Carvalho,* 794 F.2d 455–56; *Los Angeles Memorial Coliseum,* 791 F.2d at 1360.

## B. Exclusion of Evidence Relating to Lewy's Discharge

 In reviewing the trial court's decision to exclude Lewy's evidence relating to his discharge, we must examine the relative scope and purposes of the FELA and RLA, and must determine the extent to which the FELA authorizes parties to recover damages for discharge-related injuries, and the extent to which the RLA precludes courts from addressing such claims. The parties do not dispute that Lewy was entitled to recover damages un-

der the FELA for the emotional distress and anxiety he suffered as a direct result of the March, 1980 collision. *See generally Taylor v. Burlington Northern Railroad Co.,* 787 F.2d 1309, 1313 (9th Cir.1986). Nor do they dispute that he cannot recover damages in court for his emotional distress and financial losses attributable exclusively to his October, 1980 discharge. *See Crusos v. United Transportation Union, Local 1201,* 786 F.2d 970, 972 (9th Cir.1986); *Buell v. Atchison, Topeka and Santa Fe Railway Co.,* 771 F.2d 1320, 1323 (9th Cir. 1985), *cert. granted,* ── U.S. ──, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986). The parties' dispute in this appeal concerns only whether Lewy can recover damages under the FELA for the aggravation, resulting from his discharge, of the emotional condition and anxiety he originally developed because of the collision. We conclude that such claims are not cognizable under the FELA, and therefore, evidence relating to Lewy's discharge was not relevant in the present action, and was properly excluded by the trial court. *See* Fed.R.Evid. 402.

## 1. Scope of the FELA's Coverage

 The FELA was originally enacted by Congress in 1906 in order to "create[ ] a tort remedy for railroad workers injured on the job." *Lancaster v. Norfolk and Western Railway Co.,* 773 F.2d 807, 812 (7th Cir.1985); *see Yawn v. Southern Railway Co.,* 591 F.2d 312, 317 (5th Cir.), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 304 (1979). The statute's main purpose was to enable injured railroad workers to overcome a number of traditional defenses to tort liability that had previously operated to bar their actions, including contributory negligence, contractual waiver of liability, the fellow-servant rule, and assumption of the risk. *See Lancaster,* 773 F.2d at 813; 45 U.S.C. §§ 51, 53– 55; H.R.Rep. No. 1386, 60th Cong., 1st Sess. (1908); S.Rep. No. 460, 60th Cong., 1st Sess. (1908); S.Rep. No. 661, 76th Cong., 1st Sess. (1939). It was passed in "response to the special needs of railroad workers," *Sinkler v. Missouri Pacific*

*Railroad Co.,* 356 U.S. 326, 329, 78 S.Ct. 758, 762, 2 L.Ed.2d 799 (1958), and must "be construed liberally for [their] protection." *Fox v. Consolidated Rail Corp.,* 739 F.2d 929, 931 (3d Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 962, 83 L.Ed.2d 968 (1985); *accord Sowards v. Chesapeake and Ohio Railway Co.,* 580 F.2d 713, 714 (4th Cir.1978). As the Supreme Court has stated,

> restriction[s] as to the kinds of employees covered, the degree of negligence required, or the particular sorts of harms inflicted, would be contradictory to the wording, the remedial and humanitarian purpose, and the constant and established course of liberal construction of the Act followed by this Court.

*Urie v. Thompson,* 337 U.S. 163, 181–82, 69 S.Ct. 1018, 1030, 93 L.Ed. 1282 (1949).

 Section 1 of the FELA, 45 U.S.C. § 51, which is the act's main liability provision, provides that "[e]very common carrier by railroad ... shall be liable in damages to [employees] ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." Because of its broad intended scope and somewhat open-ended wording, *see Urie,* 337 U.S. at 181, 69 S.Ct. at 1030; *Buell,* 771 F.2d at 1322, this provision has been interpreted to cover at least some intentional torts as well as negligent acts.[5] *See Jamison v. Encarnacion,* 281 U.S. 635, 641, 50 S.Ct. 440, 443, 74 L.Ed. 1082 (1930) (foreman's unprovoked assault on a longshoreman, designed to increase his productivity, is "negligent" as

that term is used in the FELA); *New York Central Railroad Co. v. Winfield,* 244 U.S. 147, 152, 37 S.Ct. 546, 548, 61 L.Ed. 1045 (1917); *Taylor,* 787 F.2d at 1314–15; *Lancaster,* 773 F.2d at 812–13, 817–29. It has also been interpreted to cover negligent acts that expose employees to occupational diseases, *see Urie,* 337 U.S. at 180–81, 186–87, 69 S.Ct. at 1032–33 (involving exposure of railroad fireman to silicosis, caused by continuous inhalation of silica dust), or that subject them to oppressive working conditions, *see Yawn,* 591 F.2d at 315–17 (claim by clerical employees that office where they worked was understaffed); *McMillan v. Western Pacific Railroad Co.,* 54 Cal.2d 841, 843–45, 9 Cal.Rptr. 361, 357 P.2d 449 (1960) (claim by train dispatcher required to operate railroad's central traffic control system), as well as those that cause injuries through "external violent or accidental means." *Urie,* 337 U.S. at 186, 69 S.Ct. at 1033. We have recently interpreted FELA section 1 to cover a railroad employee's "wholly mental injury," specifically an emotional breakdown, that resulted from his supervisor's and co-workers' "harassment, threats, and intimidation [which] he suffered while employed." *Buell,* 771 F.2d at 1321, 1324;[6] *accord Taylor,* 787 F.2d at 1313; *but see Lancaster,* 773 F.2d at 813, 815 ("[T]he FELA does not create a cause of action for tortious harms brought about by acts that lack any physical contact or threat of physical contact.").

Yet regardless of how broadly courts have interpreted the scope of the FELA

---

**5.** In *Beanland v. Chicago, Rock Island and Pacific Railroad Co.,* 480 F.2d 109 (8th Cir.1973), the Eighth Circuit was required to determine, as we are in the present case, whether discharge-related damages are recoverable under the FELA. It concluded that such damages are not recoverable, because "[d]amages resulting from *intentional* acts, such as [a] discharge, have no place in a personal injury F.E.L.A. action which deals exclusively with *negligence.*" *Id.* at 113 (citing 45 U.S.C. § 51) (emphasis in original); *accord Fullerton v. Monongahela Connecting Railroad Co.,* 242 F.Supp. 622, 626 (W.D.Pa.1965).

While we agree with the result reached by the Eighth Circuit in *Beanland,* we question its

analysis on two grounds. First, as noted in the text, *supra,* we do not agree that the FELA section 1's reference to "negligence" can be read so restrictively as to exclude all intentional torts from the provision's coverage. Second, the Eighth Circuit's opinion in *Beanland* does not address the preclusive effect of the RLA, which we consider critical in determining the scope of the FELA's coverage.

**6.** We note that the Supreme Court has recently granted certiorari in *Buell, see* —— U.S. ——, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986), but also note that our decision in the present action is not dependent upon *Buell*'s holding.

section 1, they have, with one exception,[7] authorized the award of damages under the provision only for injuries sustained by workers "on the job" and in the general course of their work-related duties. *See, e.g., Taylor,* 787 F.2d at 1313–16; *Buell,* 771 F.2d at 1321–24; *Lancaster,* 773 F.2d at 812–16; *Yawn,* 591 F.2d at 314–17; *see also McSorley v. Consolidated Rail Corp.,* 581 F.Supp. 642, 645 (S.D.N.Y.1984) (the FELA's "central purpose [is to] remov[e] legal obstacles to the compensation of employees who are physically injured or killed *at work* ") (emphasis added). Courts have not treated injuries resulting from allegedly wrongful discharges and other labor law violations as "on the job" injuries in this context, and therefore, with the single exception noted above, they have not authorized the award of damages under FELA section 1 for such injuries. *See generally Crusos,* 786 F.2d at 971–72 (holding that there is no basis for federal subject-matter jurisdiction over wrongful discharge claim against railroad).

### 2. Scope of the RLA's Coverage

■ Congress enacted the RLA in 1926 in order to promote stability in the railroad industry and to provide for prompt and efficient resolution of labor-management disputes arising out of railroad collective bargaining agreements. *See Union Pacific Railroad Co. v. Sheehan,* 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (per curiam). Whereas the FELA is "a statutory mechanism designed [by Congress] to give railroad employees a federal right to sue [their employers]," *Fox,* 739 F.2d at 931, and therefore guarantees them access to the courts, Congress specifically intended in the RLA to keep railroad labor disputes *out of the courts* and instead requires the use of grievance procedures and arbitration:

In enacting [the RLA], Congress endeavored to promote stability in labor-management relations in this important

national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements. The NRAB was created as a tribunal consisting of workers and management to secure the *prompt, orderly and final settlement of grievances* that arise daily between employees and carriers regarding *rates of pay, rules and working conditions. Congress considered it essential to keep these so-called "minor" disputes within the NRAB and out of the courts.*

*Sheehan,* 439 U.S. at 94, 99 S.Ct. at 402 (citations omitted and emphasis added).

Thus, RLA section 3 First (i), 45 U.S.C. § 153 First (i), provides that all "disputes between [railroad] employees and . . . carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions"—so-called "minor disputes"—cannot be litigated in court, but must instead be referred to the NRAB for compulsory arbitration. 45 U.S.C. § 153 First (i); *see Crusos,* 786 F.2d at 972; *Graf v. Elgin, Joliet and Eastern Railway Co.,* 790 F.2d 1341, 1348 (7th Cir.1986); *Lancaster,* 773 F.2d at 812. Moreover, Congress did not provide for automatic judicial review of the NRAB's determinations:

[I]n at least some situations the Act makes the federal administrative remedy exclusive, rather than merely requiring exhaustion of remedies in one forum before resorting to another. A party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding. He is limited to the judicial review of the Board's proceedings that the Act itself provides. In such a case the proceedings afforded by 45 U.S.C. § 153 First (i), will be the only remedy available to the aggrieved party.

---

**7.** The sole exception appears to be the Second Circuit's decision in *Sharkey v. Penn Central Transportation Co.,* 493 F.2d 685 (2d Cir.1974), upon which Lewy relies. *See* the discussion of

*Sharkey* in Analysis, Section B–3, *infra; see also Brown v. World Airways, Inc.,* 539 F.Supp. 179, 181 (S.D.N.Y.1982) (discussing *Sharkey* in dictum).

*Andrews v. Louisville & Nashville Railroad Co.,* 406 U.S. 320, 325, 92 S.Ct. 1562, 1565, 32 L.Ed.2d 95 (1972) (citations omitted and emphasis added). It provided an extremely narrow right of appeal from the NRAB:

> Judicial review of Adjustment Board orders is limited to three specific grounds: (1) failure of the Adjustment Board to comply with the requirements of the Railway Labor Act; (2) failure of the Adjustment Board to conform, or confine, itself to matters within the scope of its jurisdiction; and (3) fraud or corruption.

*Sheehan,* 439 U.S. at 93, 99 S.Ct. at 402; *accord Andrews,* 406 U.S. at 325, 92 S.Ct. at 1565; *Crusos,* 786 F.2d at 972; 45 U.S.C. § 153 First (q) (1982).

■ Based on the RLA's structure and legislative history, our court and others have ruled that the grievance and arbitral mechanisms the act establishes are essentially the exclusive means for railroad employees to assert " 'minor' breaches of collective bargaining contracts ... *of which the firing of an individual worker allegedly for cause is a classic illustration." Graf,* 790 F.2d at 1348 (emphasis added); *accord Crusos,* 786 F.2d at 972 ("The [RLA] gives no right of action to railroad employees to sue their employers in federal court for wrongful discharge ... [and] employees' reinstatement actions are exclusively within the jurisdiction of the [NRAB]."); *Gonzalez v. Southern Pacific Transportation Co.,* 773 F.2d 637, 642–43 (5th Cir.1985); *Peterson v. Air Line Pilots Association, International,* 759 F.2d 1161, 1169 (4th Cir.) ("Garden variety wrongful discharge actions, so-called 'minor disputes'

involving rights under the collective bargaining agreement ... are routinely held to be within the exclusive jurisdiction of the arbitral authority created by the [RLA]."), *cert. denied,* —— U.S. ——, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985); *Jackson v. Consolidated Rail Corp.,* 717 F.2d 1045, 1052 (7th Cir.1983) ("[T]he RLA has made *any* grievance arising out of the collective bargaining agreement subject to the exclusive arbitral remedies contained in that Act."), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1000, 79 L.Ed.2d 233 (1984); *see also Buell,* 771 F.2d at 1323; *see generally Tello v. Soo Line Railroad Co.,* 772 F.2d 458, 460 (8th Cir.1985). We have consistently held that the RLA preempts state tort claims by employees against railroads for wrongful discharge or for intentional infliction of emotional distress, where the alleged tortious activity is " 'arguably' governed by the collective bargaining agreement or has a 'not obviously insubstantial' relationship to the labor contract," and where "the gravamen of the complaint is wrongful discharge." [8] *Magnuson v. Burlington Northern, Inc.,* 576 F.2d 1367, 1369–70 (9th Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *see, e.g., Beers v. Southern Pacific Transportation Co.,* 703 F.2d 425, 429 (9th Cir. 1983); *Schroeder v. Trans World Airlines, Inc.,* 702 F.2d 189, 192 (9th Cir.1983). Allowing employees to bring actions based upon such state tort claims would undermine two significant policy determinations Congress made in enacting the RLA: (1) that railroad labor disputes should be resolved through grievance procedures and arbitration, rather than litigation in the state and federal courts, *see Sheehan,* 439 U.S. at 94, 99 S.Ct. at 402; *see also Lan-*

---

**8.** The Supreme Court's decision in *Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), and several of our decisions indicate that the RLA does not preempt a state tort claim if it is "either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself." *Id.* at 305, 97 S.Ct. 1066; *accord Aragon v. Federated Department Stores,*

*Inc.,* 750 F.2d 1447, 1455–57 (9th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985); *Garibaldi v. Lucky Food Stores, Inc.,* 726 F.2d 1367, 1374–75 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2319, 85 L.Ed.2d 839 (1985); *see also Truex v. Garrett Freightlines, Inc.,* 784 F.2d 1347, 1350–52 (9th Cir. 1985). Lewy's discharge-related claims are based exclusively on the FELA, as opposed to state tort law, and do not satisfy either of these two requirements. *See Truex,* 784 F.2d at 1351–52; *see also Jackson,* 717 F.2d at 1051–54.

*caster,* 773 F.2d at 815 ("The courts see such suits [based on state tort theories] ... as end runs around the Railway Labor Act's policy of channeling employment disputes to arbitration."); and (2) that railroad employees who are wrongfully discharged are entitled to reinstatement and back pay, but should not recover damages for any resulting emotional injuries. *See Buell,* 771 F.2d at 1323; *see also Peterson,* 759 F.2d at 1169 ("The scheme of remedies and procedures carefully crafted in the RLA [which does not include remedies for emotional distress] has long been interpreted as evidence of congressional intent specifically to limit an aggrieved party's right to resort to state law as an alternative remedy for a wrongful discharge.").

For the same reasons, courts have permitted employees to litigate federal law claims relating to discharges or terms of employment, and thus to circumvent the RLA's grievance and arbitral procedures, only when their claims are *"premised on a specific federal statutory section,"* Jackson, 717 F.2d at 1050 (emphasis added), *accord Landfried v. Terminal Railroad Association of St. Louis,* 721 F.2d 254, 256 (8th Cir.1983), *cert. denied,* 466 U.S. 928, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984), and are *designed to vindicate "substantial rights intended by Congress to be judicially enforced."* Gonzalez, 773 F.2d at 643 (emphasis added); *accord Railway Labor Executives Association v. Atchison, Topeka & Santa Fe Railway Co.,* 430 F.2d 994, 997 (9th Cir.1970) ("Where ... the dispute grows out of the employment relationship and ... involves an attempt to impose a right which is incident to that relationship, the statutory forum is the [NRAB], *absent a clear expression of legislative policy to the contrary.*") (emphasis added), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971); *see Gonzalez,* 773 F.2d at 644 ("[T]he general rule that railway labor disputes are subject only to arbitration and limited judicial review must yield when employees assert rights guaranteed by a federal statute."). Courts have recognized that to adopt a broader approach and permit freer access to the courts by employees asserting discharge- or employment-related claims based on federal statutes would undermine Congress's determination that the RLA's grievance and arbitral procedures should be exclusive and its decision to limit the remedies available to railroad employees asserting employment-related claims. *See Jackson,* 717 F.2d at 1050–51; *see also Lancaster,* 773 F.2d at 813–14. Moreover, it would enable employees effectively to circumvent the Supreme Court's and other courts' decisions finding RLA preemption of state tort remedies, simply by recharacterizing their state tort claims as implicating the policies or purposes underlying various federal statutes. *See generally Jackson,* 717 F.2d at 1048–51.

Thus, courts have permitted actions by railroad employees challenging discharges or employment conditions when such challenges have been explicitly authorized by the Universal Military Training and Service Act, 50 U.S.C.App. § 459(d) (repealed 1974), *see McKinney v. Missouri-Kansas-Texas Railroad Co.,* 357 U.S. 265, 268–70, 78 S.Ct. 1222, 1224–25, 2 L.Ed.2d 1305 (1958); the Vietnam Era Veteran's Readjustment Assistance Act of 1974, 38 U.S.C. § 2021 (1982), *see Brown v. Consolidated Rail Corp.,* 605 F.Supp. 629, 632–33 (N.D.Ohio 1985); *Kidder v. Eastern Air Lines, Inc.,* 469 F.Supp. 1060, 1062–64 (S.D.Fla.1978); the Age Discrimination in Employment Act, 29 U.S.C. § 623 (1982), *see Johnson v. American Airlines, Inc.,* 487 F.Supp. 1343, 1345–47 (N.D.Tex.1980); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1982), *see Pittman v. Grand Trunk Western Railroad Co.,* 17 Empl. Prac.Dec. ¶ 8,568 (E.D.Mich.1978); *Healen v. Eastern Airlines, Inc.,* 9 Empl.Prac.Dec. ¶ 10,023 (N.D.Ga.1973); RLA section 2 Third, 45 U.S.C. § 152 Third, which prohibits coercion of railroad employees in their choice of a representative, *see Brotherhood of Railroad Trainmen v. Central of Georgia Railway,* 305 F.2d 605, 608–09 (5th Cir.1962); RLA section 2 Fourth, 45 U.S.C. § 152 Fourth, which protects railroad employees' rights to organize collectively, *see*

*Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914, 918 (7th Cir.1974); *see also Lum v. China Airlines Co.*, 413 F.Supp. 613, 615–16 (D.Hawaii 1976); and FELA section 10, 45 U.S.C. § 60, which protects railroad employees from being disciplined in retaliation for furnishing information that may give rise to an FELA action. *Hendley v. Central of Georgia Railroad Co.*, 609 F.2d 1146, 1152–53 (5th Cir.1980), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981); *accord Gonzalez*, 773 F.2d at 641–42, 644–45; *see Woodrum v. Southern Railway Co.*, 571 F.Supp. 352, 357–58 (M.D.Ga.1983), *aff'd,* 750 F.2d 876, 883 (11th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 71, 88 L.Ed.2d 58 (1985). *See also McDonald v. City of West Branch*, 466 U.S. 284, 288–92, 104 S.Ct. 1799, 1802–04, 80 L.Ed.2d 302 (1984) (civil rights action brought under 42 U.S.C. § 1983 (1982) not precluded by award in prior arbitration proceeding conducted pursuant to collective bargaining agreement); *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 734–45, 101 S.Ct. 1437, 1441–47, 67 L.Ed.2d 641 (1981) (action for back wages under Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (1982), not precluded by prior submission of claims to joint grievances committee or by National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169 (1982), and Labor Management Relations Act (LMRA), 29 U.S.C. § 171 *et seq.* (1982)); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49–50, 59–60, 94 S.Ct. 1011, 1020, 1025, 39 L.Ed.2d 147 (1974) (Title VII claim not precluded by grievance and arbitral remedies provided in collective bargaining agreement or by NLRA); *see generally Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc.*, 372 U.S. 714, 724, 83 S.Ct. 1022, 1027, 10 L.Ed.2d 84 (1963) (action for race discrimination under Colorado Anti-Discrimination Act of 1957 not preempted by RLA).

However, courts have not permitted railroad employees to litigate federal claims based on discharges or employment conditions in cases where they allege "only a violation of the *policy underlying a federal statute,*" as opposed to a violation of the

express terms of the statute itself, *Jackson*, 717 F.2d at 1050 (claim implicated policies underlying FELA) (emphasis added), or where Congress's intent to provide employees direct access to the courts is *"at best, conjectural." Railway Labor Executives*, 430 F.2d at 997 (holding that railroad employees could not bring a court challenge to carrier's partial discontinuance of train service based on section 13a of the Interstate Commerce Act, 49 U.S.C. § 13a (repealed 1978), or the policies underlying that provision, but must instead follow the RLA's grievance and arbitral procedures) (emphasis added); *see, e.g., Landfried*, 721 F.2d at 256 (claim implicated policies underlying FELA); *Brotherhood of Railroad Trainmen, John B. Gordon Lodge No. 376 v. Southern Railway Co.*, 393 F.2d 303, 307–10 (5th Cir.1968) (claim based upon general policy provisions of RLA); *see also Bay v. Western Pacific Railroad Co.*, 595 F.2d 514, 515–16 (9th Cir.1979); *Gonzalez*, 773 F.2d at 644; *Minehart v. Louisville & Nashville Railroad Co.*, 731 F.2d 342, 343–45 (6th Cir.1984) (per curiam).

*3. The Relationship of the FELA and RLA to Lewy's Discharge-Related Claims*

█ Thus, in the present action, for Lewy to assert his discharge-related claims in court under the FELA and avoid the preclusive effect of the RLA, his claims must be based upon a specific provision of the FELA, and Congress must have intended that such claims be litigated in FELA actions. *See Gonzalez*, 773 F.2d at 643; *Jackson*, 717 F.2d at 1050. Since neither of these requirements is satisfied, we conclude that the RLA precludes Lewy from raising these claims as part of his FELA action, and that they can be asserted only through the grievance and arbitral procedures prescribed by the RLA.

First, no provision of the FELA directly supports Lewy's claims for wrongful discharge or for emotional distress damages resulting from his discharge. In determining whether particular FELA provisions authorize employees to bring discharge-re-

lated claims despite the preclusive effect of the RLA, our court and others have carefully scrutinized the language of those provisions and their legislative history. Only in the case of FELA section 10, 45 U.S.C. § 60, has any court found explicit authorization for employees to challenge allegedly wrongful discharges. *See Gonzalez,* 773 F.2d at 641–42, 644–45; *accord Hendley,* 609 F.2d at 1150–53; *see also Woodrum,* 571 F.Supp. at 357–58. Moreover, no court, including those authorizing discharge-related claims to be brought under FELA section 10, has permitted employees to seek damages under the FELA for the emotional distress resulting from their discharges. *See, e.g., Hendley,* 609 F.2d at 1150–53.

FELA section 10 provides that "[a]ny contract, rule, regulation, or device whatsoever, the purpose, intent, or effect of which [is] to prevent employees of any common carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, shall be void." 45 U.S.C. § 60. The Fifth Circuit has ruled that although this provision does not explicitly establish a cause of action for railroad employees who are wrongfully discharged or disciplined, it provides federal statutory authority sufficient to overcome the preclusive effect of the RLA, and authorizes courts to enjoin ongoing disciplinary proceedings, order reinstatement, and award back pay to employees who have been discharged or disciplined in retaliation for furnishing information to potential FELA plaintiffs or other similarly "interested" persons. *See Gonzalez,* 773 F.2d at 641–42, 644–45; *Hendley,* 609 F.2d at 1150–53; *see also Woodrum,* 571 F.Supp. at 357–58. However, the Fifth Circuit has not suggested that section 10 would authorize an award of money damages to such employees for other injuries, such as emotional distress, resulting from their discharges or from being disciplined. *See Gonzalez,* 773 F.2d at 641–42, 644; *Hendley,* 609 F.2d at 1152–53. Nor would section 10's language ("[a]ny ... device [for preventing employees from furnishing information] ... *shall be void*")

support such an interpretation: at most, it appears to authorize courts to exercise equitable jurisdiction over retaliation claims, and thus to award back pay, but not additional money damages. 45 U.S.C. § 60 (emphasis added); *see Gonzalez,* 773 F.2d at 641–42, 644; *Hendley,* 609 F.2d at 1152–53 & n. 5.

■ Moreover, section 10 applies only to railroad employees discharged or disciplined for *furnishing information to others;* it does not encompass employees who are discharged or disciplined because *they themselves initiate FELA actions. See Jackson,* 717 F.2d at 1050–51; *see also Landfried,* 721 F.2d at 256; 45 U.S.C. § 60. Thus, even accepting the Fifth Circuit's interpretation of FELA section 10, Lewy is not within the class of persons that the provision protects, nor are his claims for emotional distress damages cognizable under it.

■ Except for section 10, no other FELA provision has been held to provide federal statutory authorization for railroad employees seeking to litigate wrongful discharge claims in court. In *Bay v. Western Pacific Railroad,* 595 F.2d 514 (9th Cir. 1979), we specifically rejected the claim that FELA section 5, 45 U.S.C. § 55, establishes a private right of action for employees discharged in retaliation for bringing FELA claims. *See id.* at 515–16; *accord Davidson v. Long Island Railroad Co.,* 617 F.Supp. 67, 68–70 (S.D.N.Y.1985); *see also Jackson,* 717 F.2d at 1051. Section 5 provides that "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which [i]s to enable any common carrier to exempt itself from [FELA] liability ... shall to that extent be void." 45 U.S.C. § 55. We noted in *Bay* that "[o]n its face [section 5] does not create a private cause of action," and concluded, based on the provision's legislative history and that of its predecessor, that Congress did not intend section 5 to establish a right of action for railroad employees separate from that under FELA section 1. *Bay,* 595 F.2d at 515–16. We concluded that Con-

gress enacted section 5 instead to prevent employers being sued under section 1 from claiming as a defense that the employees bringing suit had contracted away their rights under the FELA, and therefore were not eligible to recover damages under the Act. *See id.* at 516; *see also Landfried,* 721 F.2d at 256. Thus, since section 5 was enacted to eliminate a potential defense to section 1 actions, and not to create a separate right of action, it does not provide a basis for Lewy's discharge-related claims.

The only remaining FELA provision that could possibly provide statutory authority for Lewy's discharge-related claims is section 1 itself. *See* 45 U.S.C. § 51; 45 U.S.C. §§ 52–60. As we have previously noted, although courts have often interpreted this provision broadly, only one court—the Second Circuit in the *Sharkey* decision—has ever ruled that section 1 covers discharge- or employment-related claims. *See* Analysis, Section B–1, *supra; Sharkey,* 493 F.2d at 690–92; *see also Brown v. World Airways, Inc.,* 539 F.Supp. 179, 181 (S.D.N.Y. 1982) (dictum). Moreover, three circuit courts—the Sixth, Seventh, and Eighth—have expressly ruled that section 1 does not establish a private right of action for employees discharged in retaliation for filing actions under the FELA. *See Jackson,* 717 F.2d at 1050–51; *accord Minehart,* 731 F.2d at 343–45; *Landfried,* 721 F.2d at 254–56; *see Gonzalez,* 773 F.2d at 644 & n. 28; *Lancaster,* 773 F.2d at 815; *see also Graf,* 790 F.2d at 1348. These courts have concluded that the language of section 1 does not explicitly authorize actions for retaliatory discharge, and that even though such actions would vindicate "the policies underlying the FELA," that is not sufficient to "overcome the RLA mandate that [railroad employees'] exclusive remedy [for wrongful discharge lies] with administrative grievance [and arbitral] procedures." *Jackson,* 717 F.2d at 1051; *accord Landfried,* 721 F.2d at 256; *see Minehart,* 731 F.2d at 344–45; *see also Gonzalez,* 773 F.2d at 644 & n. 28. As the Seventh Circuit stated in *Jackson v. Consolidated Rail Corp.,* 717 F.2d 1045 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1000, 79

L.Ed.2d 233 (1984), "[i]n a case ... involving a railway worker subject to the RLA, yet entitled to rely upon the FELA, there is a tension between the two federal statutes [, and] ... a court must be particularly reluctant to elevate an FELA policy to the status of a federal right." *Id.* at 1051 (citing *Bay* ).

We conclude that in light of section 1's language and courts' prior interpretations of the provision, section 1 does not provide a basis for Lewy's discharge-related claims. To the extent that Lewy claims he was discharged in retaliation for initiating his FELA action against Southern Pacific, we agree with the Sixth, Seventh, and Eighth Circuits that such a claim is not actionable under section 1. *See id.* at 1050–51; *accord Minehart,* 731 F.2d at 343–45; *Landfried,* 721 F.2d at 254–56. Section 1 mentions nothing about the right of employees to challenge or recover damages for a retaliatory discharge or for any discharge, for that matter. *See* 45 U.S.C. § 51; *see also Jackson,* 717 F.2d at 1050–51; *Landfried,* 721 F.2d at 256.

To the extent that Lewy claims that section 1 entitles him to recover damages for the aggravation of his preexisting injuries caused by his discharge, merely because his original injuries are compensable under that provision, *see generally Sharkey,* 493 F.2d at 690–92, we also reject that contention. Section 1 authorizes employees "suffering injury *while ... employed* " to recover damages *"for such injury or death "*; it does not authorize an award of damages for the subsequent aggravation of such an injury. 45 U.S.C. § 51 (emphasis added). Moreover, as noted above, in light of the provision's reference to "injur[ies] while ... employed," and its requirement that those injuries be caused by the "negligence" of railroads and their employees, or by equipment "defect[s] or insufficiency," our court and others have interpreted section 1 to authorize an award of damages only for injuries sustained in the course of work-related duties, not for injuries arising outside the workplace or resulting from wrongful discharges. *Id.;*

see, e.g., Taylor, 787 F.2d at 1313–16; Crusos, 786 F.2d at 971–72; Buell, 771 F.2d at 1321–24; Lancaster, 773 F.2d at 812–16; Yawn, 591 F.2d at 314–17. Thus, even though section 1 plainly authorizes Lewy to recover damages for the emotional distress and anxiety he sustained as a direct result of the March, 1980 collision, it does not authorize him to recover damages for the subsequent aggravation of that condition caused by his discharge. As a result, Lewy's discharge-related claims are not directly supported by any provision of the FELA.

Moreover, Lewy's discharge-related claims do not satisfy the second requirement necessary to avoid the preclusive effect of the RLA: that those claims vindicate rights which Congress intended to be judicially enforced through FELA actions, rather than enforced through the RLA's grievance and arbitral procedures. See Gonzalez, 773 F.2d at 643. Determining Congress's intent as to the relative scope of the FELA and RLA in this context "involve[s] the same underlying issue" that the Supreme Court and our court have addressed in cases involving RLA preemption of state tort remedies: "whether the defendant's [alleged] misconduct, although tortious, is the sort of conduct that Congress, if it had thought about the matter, would have wanted to channel through the grievance machinery set up by the RLA; or [is] instead the sort of conduct that Congress would have wanted to leave, concurrently or exclusively, to state or federal tort remedies." Lancaster, 773 F.2d at 813–14. Congress's intent regarding the FELA's and RLA's coverage of wrongful discharge claims should be consistent with its intent concerning the RLA's preemption of state tort remedies for wrongful discharge. See id. at 813.

If employees like Lewy are permitted to assert wrongful discharge claims under the FELA, they will be entitled to bring actions based on such claims in state or federal court, 45 U.S.C. § 56, and the actions they initiate in state court will not be removable to federal court. 28 U.S.C. § 1445(a) (1982); see Lancaster, 773 F.2d at 814.

Moreover, they will be entitled in such actions to the full range of remedies available under the FELA, including damages for emotional distress. See Taylor, 787 F.2d at 1313; Buell, 771 F.2d at 1324; see also Urie, 337 U.S. at 181–82, 69 S.Ct. at 1030. However, as noted above, the Supreme Court and our court have concluded in a series of cases that in enacting the RLA, Congress consciously intended to minimize litigation of railroad labor disputes in the state and federal courts and to limit wrongfully discharged employees to the remedies of reinstatement and back pay. See Sheehan, 439 U.S. at 94, 99 S.Ct. at 402; Andrews, 406 U.S. at 325, 92 S.Ct. at 1565; Buell, 771 F.2d at 1323; Beers, 703 F.2d at 429; Magnuson, 576 F.2d at 1369–70; see also Analysis, Section B–2, supra. Allowing employees like Lewy to challenge their discharges in court under the FELA will directly undermine these objectives, and will enable employees effectively to circumvent the Supreme Court's and our decisions holding that the RLA preempts most state-created judicial remedies for wrongful discharge. See, e.g., Andrews, 406 U.S. at 323–326, 92 S.Ct. at 1564–65; Beers, 703 F.2d at 429; Magnuson, 576 F.2d at 1369–70; see also Analysis, Section B–2, supra. We cannot conclude that Congress intended such a result.

Furthermore, permitting wrongful discharge claims to be litigated in courts under the FELA will undermine the integrity and independence of the NRAB in resolving such claims. Even in cases like the present one, where the NRAB reviewed Lewy's wrongful discharge claim and ordered him to be reinstated prior to any court litigation under the FELA, allowing courts to supplement the remedies ordered by the NRAB will necessarily infringe upon its decision-making authority and its ability to effect binding resolutions of "minor" disputes. The Supreme Court has indicated that in enacting the RLA, Congress "created [the NRAB] as a tribunal consisting of workers and management to secure the prompt, orderly and final settlement of grievances that arise daily between

employees and carriers," and the Court has noted that the *NRAB's* "*effectiveness ... in fulfilling its task depends on the finality of its determinations.*" *Sheehan,* 439 U.S. at 94, 99 S.Ct. at 402 (emphasis added). Yet if employees are permitted to bring FELA actions whenever the NRAB rules that they have been wrongfully discharged, or when the NRAB rejects such claims, the NRAB's determinations of such issues will never effectively be "final."

In Lewy's case, for example, the NRAB ordered him reinstated based purely upon procedural grounds, and did not reach the merits of his wrongful discharge claims; it thus achieved an equilibrium in Lewy's case without interpreting the collective bargaining agreement or determining which party was at fault as to his discharge. However, if Lewy is permitted to litigate his discharge-related claims under the FELA, the NRAB's resolution of these claims will not have concluded the dispute—the trial court will still be required to determine the lawfulness of his discharge. We find it unlikely that Congress intended such a result, given its desire that in most cases, the NRAB should provide a final, and hopefully peaceful, resolution of "minor" disputes. *See Sheehan,* 439 U.S. at 94, 99 S.Ct. at 402.

Finally, to the extent that Lewy claims only that employees like himself, who sustain physical and emotional injuries compensable under the FELA, can also recover FELA damages for the aggravation of those injuries caused by wrongful discharges, we conclude that such a result would not be consistent with Congress's intent in enacting the FELA and RLA. There is no coherent basis for singling out the discharges of these employees and treating them differently from all other discharges under the RLA, simply because of the fortuity that the discharged employees were also injured in "accidents" covered by the FELA. We conclude that in a case like Lewy's, the underlying purposes and principles of both the FELA and the RLA will be accommodated if Lewy is fully compensated under the FELA for the damages directly flowing from the March, 1980 collision, and yet limited to the RLA's procedures and remedies for his claims arising directly out of his October, 1980 discharge.

For all these reasons, we conclude that Congress did not intend for railroad employees like Lewy to assert discharge-related claims in the courts under the FELA. We conclude that the RLA precludes employees from litigating such claims in the courts and requires them to raise these claims exclusively through its grievance and arbitral procedures.

Nor are we persuaded otherwise by the Second Circuit's 1974 decision in *Sharkey v. Penn Central Transportation Co.,* 493 F.2d 685 (2d Cir.1974), upon which Lewy relies. *Sharkey* involved a railroad ticket collector-conductor who was injured in a head-on train collision, developed a "post-traumatic conversion hysteria," and was subsequently discharged following a hearing concerning his possible responsibility for the accident. *Id.* at 687–88. The employee filed an FELA action in federal district court, and initiated a proceeding before the NRAB seeking reinstatement and back pay under RLA section 153 First (i). The principal question on appeal before the Second Circuit was whether the employee could recover damages in his FELA action for the aggravation of his psychological condition caused by his discharge, since he could not recover such damages in the NRAB proceeding. *Id.* at 688.

The Second Circuit noted that the doctrines of proximate and intervening cause apply under the FELA, and that under these doctrines, negligent actors can be held liable for "certain kinds of aggravation of the injuries" they cause, as long as the events producing the aggravation are "reasonably foreseeable." [9] *Id.* at 690–91; *see* Prosser & Keeton, *The Law of Torts*

---

9. For example, if a physician negligently aggravates an injury while attempting to provide treatment, the tortfeasor who originally caused the injury may be held liable for that aggrava-

tion. *See Sharkey,* 493 F.2d at 690; Prosser & Keeton *The Law of Torts* § 44, at 309 (1974); *see also* Prosser & Keeton § 44, at 304–05.

§ 44, at 301–19 (1984). As the court pointed out, these "foreseeable" causes of aggravation could presumably include acts committed intentionally by a defendant railroad itself, such as a discharge. *See Sharkey,* 493 F.2d at 691. Thus, the Second Circuit concluded in *Sharkey* that to the extent the injured employee's discharge and its aggravating effect were "reasonably foreseeable" at the time of the collision, they were proximately caused by the collision. *See id.* at 690–91. Moreover, the court concluded that if the NRAB found the discharge to be "wrongful"—that is, primarily attributable to improper actions by the railroad, as opposed to the employee—the discharge must be considered a "normal intervening cause," the railroad's liability under the FELA would not be "superseded," and therefore, the employee could recover under the FELA for the aggravating effect of his discharge.[10] *Id.* at 691–92.

However, in its analysis in *Sharkey,* the Second Circuit appears not to have considered the preclusive effect of the RLA, the fact that Congress intended most railroad labor disputes to be resolved outside the courts, or the possibility that Congress may not have intended the FELA to supplement the RLA's remedies of back pay and reinstatement. Although, as noted above, virtually every other court to have considered the issue has concluded that federal law claims relating to discharges of railroad employees can be litigated in court only if they are based upon "a specific federal statutory section," *Jackson,* 717 F.2d at 1050, and involve "rights intended by Congress to be judicially enforced," *Gonzalez,* 773 F.2d at 643; *see* Analysis, Section B–2, *supra,* the *Sharkey* court never addressed either of these requirements, and instead based its decision upon general tort principles and a policy-oriented desire

to provide railroad employees with full recovery for all their injuries. *See Sharkey,* 493 F.2d at 690–92. However, as we have noted, our court and others have held that claims alleging "only a violation of the policy underlying a federal statute," rather than a violation of explicit statutory provisions, are not sufficient to overcome the RLA's preclusive effect. *Jackson,* 717 F.2d at 1050; *accord Railway Labor Executives,* 430 F.2d at 997; *see* Analysis, Section B–2, *supra.* As we have indicated, no reported decision appears to have followed *Sharkey's* conclusion that discharge-related damages may be recoverable under the FELA. *But cf. Brown,* 539 F.Supp. at 181 (dictum).

For all these reasons, we reject the Second Circuit's conclusion in *Sharkey.* We conclude that the RLA precludes Lewy from raising claims relating to his discharge under the FELA.

Because Lewy's discharge-related claims are not cognizable under the FELA, the trial court should have excluded all evidence relating to his discharge on the ground that it was irrelevant under Federal Rule of Evidence 402. *See* Fed.R.Evid. 402. We therefore affirm the trial court's decision to exclude that evidence. *See Lofton,* 781 F.2d at 1392 (court of appeals may affirm trial court ruling on any ground supported by the record).

## C. Exclusion of Evidence Relating to Jere Brown's Bias

Lewy's remaining claims are meritless. He contends that the trial court abused its discretion when it limited his testimony concerning Jere Brown's bias against him and his cross-examination of Brown, based upon Federal Rule of Evidence 403. Lewy maintains that the exclusion of this evi-

---

**10.** The majority in *Sharkey* stated this principle by negative implication:

> Assuming the jury ... found that the discharge and its aggravating effect was [sic] reasonably foreseeable—and this issue would first have to be resolved—[we] fail to perceive any logical basis for permitting recovery for its aggravating effect *unless* the discharge was

improper and not the result of wrongful conduct on Sharkey's part.

493 F.2d at 691 (emphasis added). One court, in dictum, has read this passage as authorizing actions for certain discharge-related damages under the FELA. *See Brown v. World Airways, Inc.,* 539 F.Supp. 179, 181 (S.D.N.Y.1982) (dictum).

dence effectively prevented him from establishing Brown's bias and her lack of credibility.

■ We reject Lewy's contention. The Supreme Court has indicated that "[p]roof of [a witness's] bias is almost always relevant [under Federal Rule 401, and therefore admissible under Federal Rule 402,] because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony"; moreover, a "showing of bias ... would have a tendency to make the facts to which [the witness] testified less probable in the eyes of the jury than [they] would be without such testimony." [11] *United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 468–69, 83 L.Ed.2d 450 (1984); *see also Delaware v. Van Arsdall,* — U.S. —, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Thus, Lewy was entitled to introduce evidence of Brown's bias both by cross-examining her and through presentation of extrinsic evidence—in this case, Lewy's own testimony. *See Abel,* 105 S.Ct. at 468–69; *see also Van Arsdall,* 106 S.Ct. at 1435; *Reiger v. Christensen,* 789 F.2d 1425, 1433 (9th Cir.1986); 3 Weinstein and Berger, *Weinstein's Evidence* § 607[03], at 607–23 (1986).

However, the Supreme Court and our court have held that while parties are usually entitled to introduce some evidence of witnesses' biases, courts have "wide discretion" under Rule 403 to impose limits on the quantity and type of evidence that they introduce. *Abel,* 105 S.Ct. at 470; *accord Van Arsdall,* 106 S.Ct. at 1435; *see Reiger,*

789 F.2d at 1433; *see also United States v. Jackson,* 756 F.2d 703, 706–07 (9th Cir. 1985); *United States v. McClintock,* 748 F.2d 1278, 1290 (9th Cir.1984), *cert. denied,* — U.S. —, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985); 3 Weinstein and Berger, § 607[03], at 607–25–29. As long as a jury is provided "sufficient information [overall] to appraise the bias and motives of [a] witness," we have generally not found the trial court to have abused its discretion.[12] *United States v. Ray,* 731 F.2d 1361, 1364–65 (9th Cir.1984); *accord Jackson,* 756 F.2d at 707; *Skinner v. Cardwell,* 564 F.2d 1381, 1389 (9th Cir.1977), *cert. denied,* 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978).

In the present action, the trial court permitted Lewy to introduce testimony that there was "bad blood" between him and Brown, and that her removal as executrix of their father's estate and his subsequent appointment as executor "to investigate her dealings" had "caused a flare-up in [their] relationship." Moreover, it permitted extensive cross-examination of Brown concerning her removal as executrix and the charges of embezzlement against her. The trial court restricted testimony only involving the "side issue[s]" of whether Brown actually embezzled funds from the estate and whether her share of the estate was ultimately withheld from her: the court ostensibly wanted to avoid debating and relitigating these matters in Lewy's FELA action.

■ Thus, the trial court accorded Lewy ample opportunity to demonstrate that he and Brown had a hostile relation-

---

**11.** The Supreme Court has defined bias as "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest." *United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984).

**12.** *United States v. Harvey,* 547 F.2d 720 (2d Cir.1976), the primary case upon which Lewy relies concerning his right to introduce evidence of Brown's bias against him, is inapposite. In *Harvey,* the Second Circuit reversed the trial

court for completely excluding testimony that the sole witness implicating the defendant in a particular bank robbery had previously accused him of fathering her child and refusing to support it. *Id.* at 722. The Second Circuit held that although the trial court had discretion to limit the evidence of bias a party introduces, the total exclusion of such evidence in Harvey's case prevented him from advancing a possible defense. *Id.* at 723; *see also Delaware v. Van Arsdall,* — U.S. —, 106 S.Ct. 1431, 1435–36, 89 L.Ed.2d 674 (1986). In contrast, in Lewy's case, the trial court did not totally exclude evidence of Brown's possible bias.

ship, and that Brown might therefore be inclined to slant her testimony against him. *See Abel,* 105 S.Ct. at 469. It is not clear that further testimony indicating that Brown actually embezzled funds, which might have been extremely time-consuming and confusing to the jury, would have made the likelihood that she slanted her testimony against Lewy appear any greater in the jury's eyes; the jury already had a basis to conclude that Brown was biased against Lewy regardless of whether she was in fact an embezzler whom he discovered or an innocent person whom he unjustly accused of embezzlement.[13] We conclude that the jury had "sufficient information to appraise [Brown's] bias and motives" in testifying against Lewy, *Ray,* 731 F.2d at 1364–65; *accord Jackson,* 756 F.2d at 707, and therefore conclude that the trial court's limited exclusion of evidence relating to Brown's alleged embezzlement did not constitute an abuse of discretion. *See Abel,* 105 S.Ct. at 470.

### D. The Trial Court's Jury Instructions

Finally, Lewy challenges the trial court's jury instructions, claiming that they were repetitive and unduly emphasized Southern Pacific's contention that he was guilty of contributory negligence and that any judgment in his favor should therefore be reduced. We disagree.

We have recently stated that "[s]o long as [jury] instructions fairly and adequately cover the issues presented, the judge's formulation of those instructions or choice of language is a matter of discretion." *United States v. Echeverry,* 759 F.2d 1451, 1455 (9th Cir.1985); *accord Carvalho,* 794 F.2d at 455–56. Lewy does not contend that any of the jury instructions were erroneous. He maintains only that a single instruction, which defined the principle of causation, was "unnecessary" and "repetitive," and focussed the jury's attention upon his possible contributory negligence. However, the mere fact that an instruction is repetitive is not a basis for reversal, as long as the legal principles it enunciates are correct: we have specifically held, albeit in a slightly different context, that a judge's repetition to the jury of an instruction that correctly states the law is not reversible error. *See Gebhard v. United States,* 422 F.2d 281, 288–89 (9th Cir.1970). Moreover, as noted above, although Lewy contends that the challenged instruction focussed undue attention upon his conduct, it nowhere contains the words "plaintiff" or "Lewy," and simply refers to the "negligence ... *of any party.*"

Lewy contends that because the challenged instruction immediately followed an instruction discussing contributory negligence, the jury would logically interpret it as referring primarily to him.

---

**13.** Lewy's counsel maintained both at trial and in his original appellate brief that he sought to introduce testimony concerning the embezzlement charges against Brown solely to demonstrate her bias. As we have noted, Lewy was permitted to introduce sufficient testimony at trial to establish that Brown may have been biased against him.

However, in Lewy's reply brief, he contends for the first time that the testimony relating to Brown's alleged embezzlement should have been permitted on the ground that it related to the issue of Brown's credibility. This contention is meritless. Federal Rule of Evidence 608(b) prohibits the use of extrinsic evidence to prove specific instances of conduct on the part of a witness that are intended to undermine her credibility. Fed.R.Evid. 608(b); *see Abel,* 105 S.Ct. at 470–71; 3 Weinstein and Berger, § 608[05], at 608–21–22. Thus, Rule 608(b) would not have authorized Lewy to testify in his

direct examination concerning Brown's alleged embezzlement in order to demonstrate her *lack of credibility, see* Fed.R.Evid. 608(b), and he was permitted to offer such testimony only to demonstrate her *bias. See Abel,* 105 S.Ct. at 470–71.

Moreover, although Rule 608(b) authorized Lewy to cross-examine Brown on specific instances of her conduct that would be probative on the issue of her credibility, the rule expressly authorizes courts to limit such questioning "in [their] discretion." Fed.R.Evid. 608(b); *see also* 3 Weinstein and Berger, 608[05], at 608–33–35. As noted above, the trial court permitted Lewy to cross-examine Brown to a certain extent about the embezzlement charges against her. Thus, even if Lewy had timely claimed that the evidence of Brown's alleged embezzlement was offered to demonstrate her lack of credibility, we would conclude that the trial court did not abuse its discretion in limiting that evidence as it did. *See* Fed.R.Evid. 608(b).

However, the preceding instruction also mentioned the possibility that the jury could find Southern Pacific negligent. As a result, we conclude that the jury logically would have interpreted the challenged instruction to refer to *both* parties. Based upon our review of the instructions as a whole, we conclude that they were not "'misleading or ... inadequate to guide the jury's deliberations,'" *Shortt Accountancy*, 785 F.2d at 1454, and that the trial court did not abuse its discretion in formulating the instructions as it did. *See Benny*, 786 F.2d at 1416; *accord Carvalho*, 794 F.2d at 455–56; *Los Angeles Memorial Coliseum*, 791 F.2d at 1360.

### CONCLUSION

We conclude that the RLA precluded Lewy from recovering damages based upon his discharge in his FELA action. As a result, we conclude that the trial judge properly excluded Lewy's evidence relating to his discharge. We also conclude that the trial judge did not abuse his discretion either in limiting the presentation of evidence relating to Jere Brown's bias or in instructing the jury as he did. We therefore affirm the judgment of the district court.

AFFIRMED.